UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

          -against-

BRIAN KOLFAGE,
STEPHEN BANNON,
ANDREW BADOLATO, and
TIMOTHY SHEA,

                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5/5/2021_

20 Cr. 412 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendant Brian Kolfage moves for an order modifying the post-indictment restraining order issued on August 24, 2020, which prohibits the transfer of certain funds involved in his charged offenses (the "Restraining Order"), ECF No. 64. Alternatively, he requests a hearing to challenge the Court's finding that there was probable cause for the issuance of the Restraining Order, ECF No. 77. For the reasons stated below, Kolfage's motions are DENIED without prejudice.

## BACKGROUND

On August 17, 2020, a grand jury returned a sealed indictment charging Defendants, Brian Kolfage, Stephen Bannon, Andrew Badolato, and Timothy Shea, with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Indictment, ECF No. 2. The indictment alleges that, in a conspiracy occurring "from at least in or around December 2018 up to and including the date of the filing of this Indictment," Defendants fraudulently induced donors to contribute millions of dollars to an online crowdfunding campaign known as We Build the Wall. *Id.* ¶¶ 1, 27–29. The indictment further states that Kolfage, Bannon, and Badolato made repeated false

statements—on the crowdfunding website, We Build the Wall's website, and in social media, press releases, and donor solicitations—that money from the fundraising campaign would not be taken for Defendants' personal use, and that all funds would go to the campaign's stated mission: building a wall at the southern border of the United States. *Id.* ¶¶ 1, 9, 11–14. Despite these representations, Defendants allegedly took hundreds of thousands of dollars for their personal use. *Id.* ¶ 17. Kolfage claims that "[he] and his codefendants' alleged agreement to act under false pretenses ended in January 2020" when "[We Build the Wall's] website was changed to disclose that [Kolfage] would receive a salary." Def. Mem. at 5, ECF No. 77.

The indictment contemplates that if Defendants were convicted, they would have to forfeit certain property involved in the alleged crimes under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c). Indictment ¶¶ 34–35. The indictment was unsealed on August 20, 2020. ECF No. 3.

On August 24, 2020, the Court granted the Government's *ex parte* application for a sealed restraining order pursuant to 18 U.S.C. §§ 981, 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461. Restraining Order at 1–2. The Restraining Order restrains the transfer of funds into or out of three We Build the Wall bank accounts. *Id*. It does not restrain funds acquired after the Restraining Order was issued. ECF No. 63 at 21. The Court found probable cause to grant the Restraining Order because the Government's application (the "Restraining Order Application") and the supporting affidavit of United States Postal Inspector Troy Pittenger (the "Pittenger Affidavit"), both filed *ex parte* and under seal, demonstrate that assets in the accounts "are subject to restraint and forfeiture as proceeds of a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and/or property involved in money laundering, in violation of Title 18, United States Code, § 1956." Restraining Order at 1. On December 14,

2020, the Court unsealed the Restraining Order, but denied non-parties We Build the Wall and Kris Kobach's motion to unseal the Restraining Order Application and the Pittenger Affidavit. ECF No. 63 at 23.

According to Kolfage, prior to the unsealing of the Indictment, and before he was aware of a criminal investigation, We Build the Wall took out a liability insurance policy (the "Policy") from Ironshore Specialty Insurance Company ("Ironshore"), which covers up to $1 million in legal fees and costs with respect to criminal charges brought against We Build the Wall's directors and officers. Kolfage Decl. ¶ 3, ECF No. 77-1. Under the Policy, before Ironshore begins coverage on a claim, a defendant must satisfy an "insurance retention amount," by "demonstrat[ing] to Ironshore that $125,000 in valid legal fees and expenses have been incurred and paid on [a defendant's] behalf from a source of funds other than Ironshore." *Id.*

Upon his indictment, Kolfage retained Harvey A. Steinberg, Esq., and his law firm, Springer & Steinberg, P.C. ("Steinberg"). *Id.* ¶ 2. Steinberg agreed to represent Kolfage "pursuant to [the Policy]," and to forgo a retainer. *Id.* ¶ 4. Since beginning its representation, Steinberg has billed substantial legal fees. *Id.* ¶ 5.

Ironshore agrees that the Policy covers Kolfage's legal fees in this action, contingent on the payment of the insurance retention amount. *Id.* ¶ 3. We Build the Wall has committed to paying the $125,000. *Id.* ¶ 4. Kolfage claims that without the restrained funds, We Build the Wall cannot afford the payment.[1] *Id.* ¶ 4. Accordingly, the Policy has not taken effect, and Ironshore has not paid Steinberg. *Id.* ¶ 3. Steinberg has told Kolfage that without payment, it

---

[1] On December 14, 2020, the Court denied We Build the Wall's motion to modify the Restraining Order. ECF No. 63. We Build the Wall appealed, ECF No. 73, and the issue is currently before the Second Circuit. *See United States v. Kolfage*, 20-4274 (2d Cir.).

3

will have to withdraw from this action. *Id.* ¶ 5. If Steinberg withdraws, Kolfage states that it will be a "substantial hardship" for him to secure other counsel. *Id.*

In order to satisfy the insurance retention amount, Kolfage seeks an order modifying the Restraining Order to permit We Build the Wall to access funds received after January 2020, the date We Build the Wall's website disclosed Kolfage's salary. Def. Mem. at 6.

## DISCUSSION

I. <u>Legal Standard</u>

The statutory framework for criminal forfeiture provides that if, upon the return of an indictment, the court finds probable cause that certain property would be subject to forfeiture upon conviction, the court may enter a pretrial restraining order to preserve the availability of that property. *See* 21 U.S.C. § 853(e)(1); *Kaley v. United States*, 571 U.S. 320, 323 (2014). As "the government needs some means of promptly heading off any attempted disposal of assets that might be made in anticipation of a criminal forfeiture," these restraining orders can be issued *ex parte* and without a prior hearing. *United States v. Monsanto*, 924 F.2d 1186, 1193 (2d Cir. 1991), *abrogated on other grounds by Kaley*, 571 U.S. 320.

When a pretrial restraining order prohibits a defendant from using funds to pay for counsel, tensions may arise between the restraining order and the defendant's Fifth Amendment right to due process and his Sixth Amendment right to counsel. *Id.* at 1193. However, "neither the Fifth nor the Sixth Amendment to the Constitution requires Congress to permit a defendant to use assets adjudged to be forfeitable to pay that defendant's legal fees." *United States v. Monsanto*, 491 U.S. 600, 614–15 (1989) (applying this rule to pretrial restraining orders) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989)). Therefore, so long as a court finds probable cause that the restrained assets are forfeitable, a defendant is not entitled to

modification of the restraining order to allow him to access funds to pay for an attorney. *Id.* at 616; *cf. Luis v. United States*, 136 S. Ct. 1083, 1093 (2016) ("[I]nsofar as innocent (*i.e.*, untainted) funds are needed to obtain counsel of choice, . . . the Sixth Amendment prohibits [a pretrial restraining order on those funds].").

Given the constitutional rights at stake, when a defendant raises a concern that a pretrial restraining order freezes assets necessary for him to obtain counsel, he may request a *Monsanto* hearing to challenge the Court's *ex parte* finding that probable cause existed for the issuance of the restraining order. *Monsanto*, 924 F.2d at 1203. At the hearing, the Government must demonstrate that there is probable cause that the assets are indeed forfeitable upon conviction, a showing which has two components: "(1) that the defendant has committed an offense permitting forfeiture," which is established by a grand jury's indictment, and "(2) that the property at issue has the requisite connection to that crime," that is, that it is traceable to the alleged offense. *Kaley*, 571 U.S. at 323–24, 398. A defendant may challenge probable cause only on the second ground. *Id.* at 398. If the government cannot meet its burden to demonstrate probable cause, the restraining order must be modified. *See In re Seizure of All Funds in Accts. in Names Registry Publ'g Inc.*, 68 F.3d 577, 579–80 (2d Cir. 1995) (describing district court proceedings).

II. Applicability of the *Stein* Case

Kolfage argues that the modification of the Restraining Order is governed not by *Monsanto*, but by the Second Circuit's decision in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008). Def. Mem. at 3–4. In *Stein*, the government was investigating a potential tax fraud related to defendants' employer, KPMG, and certain of its employees. *Id.* at 137. At the commencement of the investigation, KPMG announced that it would pay for the attorney of any employee the Government asked to interview. *Id.* However, at that time, the Government's

policy was to consider, in determining the corporation's culpability for the fraud, "whether the corporation appears to be protecting its culpable employees and agents [through] a corporation's promise of support to culpable employees and agents, . . . *through the advancing of attorneys fees*." *Id.* at 136 (emphasis in original).  During the investigation, the Government leveraged this policy to pressure KPMG to withdraw their commitment to cover legal fees and to encourage their employees to waive their right to counsel.  *Id.* at 142–44.  Ultimately, employees of KPMG were indicted, but KPMG was not.  *Id.* at 139–41.

The employees moved to dismiss the indictment, on the ground that the government's inducement of KPMG's withdrawal of its legal fees policy violated the employees' right to counsel, because without the policy they could not afford their preferred attorneys.  *Id.* at 140. The district court granted the motion, reasoning that the Sixth Amendment protects the right "to use one's own funds to mount the defense that one wishes to present," that the "defendants reasonably expected to receive legal fees from KPMG [and so] the fees 'were, in every material sense, their property,'" and, therefore, "the government's interference with the right of individual criminal defendants to obtain resources lawfully available to them in order to defend themselves" was unlawful.  *Id.* at 151 (quoting *United States v. Stein (Stein I)*, 435 F. Supp. 2d 330, 366–69 (S.D.N.Y. 2006)).  The Second Circuit affirmed, holding that, "the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain."  *Id.* at 156.

Kolfage argues that *Stein* controls because like the *Stein* defendants, he relied on his employer to pay his legal fees, and the Government's actions interfered with that relationship. Def. Mem. at 3–6.  The Court disagrees.

6

"[S]ince the Second Circuit decided *Stein* nearly [thirteen] years ago, no court appears to have relied on the case to find a Sixth Amendment violation." *United States v. Fisher*, 273 F. Supp. 3d 354, 362 (W.D.N.Y. 2017). Instead, courts have distinguished *Stein* on two grounds: the absence in those cases of governmental misconduct, and the court's probable cause finding of forfeitability regarding the employer's funds.

First, the *Stein* court focused on the purposeful, unjustified governmental interference with the relationship between defendant and counsel. *See Stein*, 541 F.3d at 156 ("[S]urely [the Sixth Amendment] prohibits the government from interfering with financial donations by others, such as family members and neighbors—and employers."). Accordingly, courts read *Stein* to have held that "[the Sixth Amendment right to counsel] is violated when the government, *without other justification*, intervenes to prevent a corporation under investigation from advancing legal fees to indicted employees." *United States v. Emor*, 794 F. Supp. 2d 143, 147 (D.D.C. 2011) (emphasis added); *United States v. Dupree*, 781 F. Supp. 2d 115, 142–43 (E.D.N.Y. 2011). For example, the Third Circuit, analyzing *Stein*, has required a "desire or purpose to deliberately interfere with counsel." *United States v. Fattah*, 858 F.3d 801, 809 (3d Cir. 2017) (internal quotation marks omitted).

Here, Kolfage argues that "the government has done more than discourage [We Build the Wall] from paying for [his] defense. By obtaining the overbroad, ex-parte [R]estraining [O]rder the [G]overnment prevented [We Build the Wall] from paying for it." Def. Reply at 3, ECF No. 91. However, Kolfage alleges neither prosecutorial misconduct, nor that the Government provided no justification for the Restraining Order, nor that the Government sought the Restraining Order with the desire or purpose of interfering with Kolfage's relationship with his counsel.

7

Second, the *Stein* court stressed that there was no suggestion that the defendants' alleged offenses had tainted the funds that KPMG would use to pay the defendants' legal fees. *See Stein*, 541 F.3d at 155 ("Although 'there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, a defendant still possesses a qualified Sixth Amendment right to use *wholly legitimate funds* to hire the attorney of his choice.'" (emphasis in original) (quoting *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001))). Accordingly, courts have distinguished *Stein* where the Government alleges that the funds defendants seek to access are forfeitable. *See United States v. Clark*, 717 F.3d 790, 804 (10th Cir. 2013); *United States v. Lacey*, 378 F. Supp. 3d 814, 819–20 (D. Ariz. 2019); *United States v. Bonventre*, No. 10 Cr. 228, 2011 WL 1197853, at *4 (S.D.N.Y. Mar. 30, 2011).

Analogous to *Clark*, *Lacey*, and *Bonventre*, but unlike in *Stein*, here the Government alleges that the restrained funds—including the funds received after January 2020 but before the Indictment was returned—are subject to forfeiture as proceeds of a conspiracy to commit wire fraud and property involved in money laundering. Indictment ¶¶ 34–35. Supporting these allegations are the grand jury's finding that, contrary to Kolfage's contention, there was probable cause that the alleged fraud continued until the case was indicted in August 2020, Indictment ¶ 27; *see Kaley*, 571 U.S. at 323–24 ("[T]he grand jury gets the final word."), and the Government's *ex parte* submissions, *see* Restraining Order at 1. Therefore, "[g]iven the probable cause findings, this case, at least at this point, is much more like *Monsanto* and *Caplin*." *Lacey*, 378 F. Supp. 3d at 820.

Moreover, Kolfage's seeking to unfreeze a third-party's funds, rather than his own, does not change the analysis. *Emor*, 794 F. Supp. 2d at 147 (denying a defendant's attempt to unfreeze third-party funds where "the pretrial restraint of likely forfeitable assets is legally and

8

factually justified by goals unrelated to any desire by the government to interfere with the payment of the legal fees of criminal defendants"); *United States v. Galante*, No. 06 Cr. 161, 2006 WL 3826701, at *1 (D. Conn. Nov. 28, 2006) (distinguishing a defendant's seeking to release third-party funds because in *Stein* "[t]he corporate employer . . . had not, itself, been indicted and no restraining order had been issued with respect to its assets").

Kolfage's reliance on *Stein* is, therefore, misplaced.

III.   Request for a *Monsanto* Hearing

    A.   Threshold Requirement

In the alternative to modifying the restraining order under *Stein*, Kolfage requests a *Monsanto* hearing to challenge the Court's finding of probable cause for the Restraining Order. Def. Mem. at 6–7.  Before the Court grants a request for a *Monsanto* hearing, the defendant "must demonstrate, beyond the bare recitation of the claim, that he . . . has insufficient alternative assets to fund counsel of choice" through a "sufficient evidentiary showing that there are no sufficient alternative, unrestrained assets to fund counsel of choice."[2]  *United States v. Bonventre*, 720 F.3d 126, 128, 131 (2d Cir. 2013).  Defendant's burden is "analogous to a defendant's burden under the Criminal Justice Act ('CJA') to show that he is unable to afford representation."  *United States v. Daugerdas*, No. 09 Cr. 581, 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012).

Kolfage argues that he does not need to prove his inability to fund his defense, because *Stein* did not require a threshold showing to find a Sixth Amendment violation.  Def. Reply at 4. But, the Court has concluded that this case is not governed by *Stein*.  *See supra* Part II.

---

[2] Unlike in other circuits, in the Second Circuit a defendant need not "make a formal *prima facie* showing that the funds were illegitimately restrained, beyond providing a basis for bringing a motion for a *Monsanto* . . . hearing in the moving papers." *Bonventre*, 720 F.3d at 131 (internal citation omitted).

9

Accordingly, Kolfage must submit evidence that without modification of the Restraining Order "his net financial resources and income are insufficient to enable him to obtain qualified counsel." *Daugerdas*, 2012 WL 5835203, at *2.

In his declaration, Kolfage claims that he cannot pay his lawyer without We Build the Wall's insurance. Kolfage Decl. ¶ 5. This "bare recitation" does not meet the required threshold. *Bonventre*, 720 F.3d at 128. Kolfage has stated that he is prepared to submit the required financial affidavit if required, Def. Mem. at 7, and the Court shall permit him to do so.

In addition, as Kolfage is seeking to unfreeze We Build the Wall's funds to pay for his defense, the Court also requires evidence that We Build the Wall needs the restrained funds to pay the $125,000 and that We Build the Wall will, in fact, use the funds to do so. *See Emor*, 794 F. Supp. 2d at 149–50 (requiring information regarding a third-party employer whose frozen assets defendant asserted would pay for his legal fees, because "there is no reason to believe that due process requires a hearing whenever a third[ ]party wishes to cover a defendant's legal expenses using seized assets in lieu of other, more readily available assets").

      B.      Request for *Ex Parte* Submission

Kolfage requests he be permitted to submit the financial affidavit *ex parte*, or, if the Court declines to permit that, to "preclude the government from being able to use, directly or derivatively, any statements in the affidavit against" him. Def. Reply at 6. Kolfage contends that the Government may attempt to use such statements as proof of guilt, and permitting the Government to do so would put Kolfage in the untenable position of choosing between his Sixth Amendment right to counsel, and his Fifth Amendment right to not self-incriminate. *Id.* at 5–6.

The Court is aware of "no cases that provide guidance on reconciling the tension between the Fifth Amendment and the Sixth Amendment . . . where Defendant would have to produce

10

financial data to prevail in his quest for the release of seized assets to hire counsel of his choice," but the issue has arisen in the analogous circumstance of the affidavits used to establish a defendant's eligibility for a lawyer appointed under the CJA. *U.S. v. Bokhari*, 185 F. Supp. 3d 254, 266 (D. Mass. 2016).

Second Circuit defendants are not automatically entitled to make an *ex parte* submission when demonstrating that CJA eligibility might raise Fifth Amendment concerns. *United States v. Harris*, 707 F.2d 653, 662–63 (2d Cir. 1983). Courts generally "either permit[] the defendant to present financial information through *ex parte*, *in camera* proceedings with the information subsequently placed under seal, or conduct[] an adversarial proceeding but set[] specific limits on the subsequent use of any information presented by the defendant during the inquiry." *United States v. Hilsen*, No. 03 Cr. 919, 2004 WL 2284388, at *4 (S.D.N.Y. Oct. 12, 2004). The Second Circuit has "expressly endorsed the latter option," and set forth the "guiding principles" that "'facts are best determined in adversary proceedings,' the importance of which process outweighs any 'speculative possibility of inadequate protection of defendant's [F]ifth [A]mendment rights,' particularly where those rights are otherwise protected by limitations imposed on the government's use of information supplied by a defendant in aid of his or her application for appointed counsel." *Id.* at *4, 8 (quoting *Harris*, 707 F.2d at 662–63). Accordingly, the *Hilsen* court concluded that, under *Harris*, unless the conflict between the Fifth and Sixth Amendments was "immediate and real" and there was more than the "the bare assertion that disclosure of this information would present a substantial hazard of self-incrimination," a court should not permit an *ex parte* submission. *Id.* at *9–10.

Echoing *Harris*, courts in this circuit have almost uniformly denied requests to file a CJA affidavit *ex parte*, including where the defendants were charged with fraud. *See, e.g.*, *United*

11

*States v. Coniam*, 574 F. Supp. 615, 617–18 (D. Conn. 1983); *United States v. Hennessey*, 575 F. Supp. 119, 120 (N.D.N.Y. 1983), *aff'd*, 751 F.2d 372 (2d Cir. 1984). In the one instance where a court granted the party an *ex parte*, *in camera* hearing, the defendant was requesting a CJA attorney for sentencing, where the defendant's underlying conviction was for perjury on the court based on the defendant's submission of false statements in an affidavit supporting his request for CJA counsel in a separate case. *United States v. Jenkins*, 130 F. Supp. 3d 700, 704–05 (N.D.N.Y. 2015), *aff'd*, 727 F. App'x 732 (2d Cir. 2018).[3]

Here, Kolfage claims that his Fifth Amendment concerns arise from the Government's "hyper-critical" scrutiny of his finances, in which it "appears to consider every financial decision [Kolfage] has made [as] evidence of guilt," and so he is "hesitant to provide the [G]overnment with additional information that, although innocent, the [G]overnment will most likely twist and contort to support the charges filed against him." Def. Reply at 6. These concerns are speculative. *Cf. Coniam*, 574 F. Supp. at 618 (denying an *ex parte* submission where "[d]efendant has merely suggested that unsealing 'may provide the government with access to information relevant to the prosecution which may be developed into inculpatory evidence beyond the scope of use immunity protection.'"); *Hilsen*, 2004 WL 2284388, at *1 (denying an *ex parte* submission despite [the defendant's] assertion that "disclosure . . . would present a substantial hazard of self-incrimination in violation of the Fifth Amendment . . . because the facts to be set forth in the CJA 23 are directly related, if not identical, to the facts the government must establish at trial concerning the sole count of the indictment against [the defendant]").

---

[3] Courts have occasionally also permitted *ex parte* submissions for non-Fifth Amendment reasons. *See United States v. Parker*, No. 00 Cr. 53A, 2004 WL 2095684, at *4 (W.D.N.Y. Sept. 14, 2004), *aff'd*, 439 F.3d 81 (2d Cir. 2006) (attorney-client privilege); *United States v. Venator*, 568 F. Supp. 832, 836–37 (N.D.N.Y. 1983) (granting a temporary *ex parte* submission due to "the interests in a speedy and just disposition of this criminal matter," where the case was scheduled to go to trial in two days).

Accordingly, Kolfage's request to submit an *ex parte* affidavit in support of his application for a *Monsanto* hearing is DENIED.

However, the Second Circuit was clear that in disfavoring *ex parte* submissions to resolve the Fifth and Sixth Amendment tensions, it was not leaving the defendant in an untenable spot. *See Harris*, 707 F.2d at 662 (holding that "the rule that a defendant's testimony at a pretrial hearing will not be admissible at trial on the issue of guilt unless he fails to object" is applicable to CJA affidavits). Kolfage's affidavit shall be afforded the same scope of use immunity given with respect to CJA affidavits, meaning the protections and limitations of such immunity apply. *See, e.g.*, *United States v. Kahan*, 415 U.S. 239, 242–43 (1974); *U.S. v. Branker*, 418 F.2d 378, 381 (2d Cir. 1969); *Hilsen*, 2004 WL 2284388, at *11. Therefore, the Government shall not be permitted to use in its direct case information contained in Kolfage's affidavit that is not otherwise available.

## CONCLUSION

For the reasons stated above, Kolfage's motions are DENIED without prejudice. By **May 19, 2021**, Kolfage may submit evidence demonstrating that he meets the threshold for a *Monsanto* hearing, along with a motion to seal the affidavit from the public if desired.

SO ORDERED.

Dated: May 5, 2021
New York, New York

_____
ANALISA TORRES
United States District Judge