THE LAW FIRM OF

# César de Castro, P.C.

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

April 12, 2023

*Via* ECF

The Honorable Analisa Torres
U.S. District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Brian Kolfage,* 20 Cr. 412 (AT)

Dear Judge Torres,

This Court should vary downward from the advisory Sentencing Guidelines and sentence Brian Kolfage, Jr. to a period of home incarceration and increase the term under which Mr. Kolfage will be supervised by the Department of Probation. Home incarceration is warranted because: (1) his history and characteristics establish that the offenses were aberrant behavior in an otherwise remarkable and law-abiding life; (2) The Bureau of Prisons ("BOP") is not equipped to adequately care for Mr. Kolfage; (3) the nature and circumstances of the offense establish that Mr. Kolfage participated and benefitted from the conspiracy but he was only a symbolic leader and was not an organizer or decision maker; and (4) any sentence of imprisonment after considering the sentences of defendants with similar conduct and the other sentencing factors would result in an unwarranted sentencing disparity.

Mr. Kolfage is the most severely wounded airman to survive any war. In Iraq on September 11, 2004, a rocket landed three feet away from him changing his life forever. He lost three limbs and suffered debilitating injuries to his remaining limb. After dozens of surgeries, years of rehabilitation, cutting edge mobility aids, a home specially built that allows for him to live with as minimal assistance as possible, and daily medications including narcotics to manage his pain, Mr. Kolfage still requires substantial daily care to perform his daily activities. His survival was remarkable, and he counts his blessings each day, but each day is a struggle. While the Guidelines and Probation recommend a term of incarceration, that unfortunately requires the court to essentially hope that the BOP can appropriately care for Mr. Kolfage. A gamble on the BOP is risky. Its track record does not support the claim that it can handle someone as disabled as Mr. Kolfage who will require around the clock care at great taxpayer expense.

Mr. Kolfage is a first-time offender who has accepted responsibility and whose conduct in this case is an aberration in an otherwise law-abiding life. And while he was a leader in the charged conspiracy and benefitted from it, he was largely a symbolic leader in name only who had little say in the decisions made on behalf of We Build the Wall. Accordingly, this Court should vary substantially as reflected in the sentences of other fraud related offenses in this Circuit and sentence Mr. Kolfage to time-served and increase the time under which he will be subject to supervised release.

I.      The United States Advisory Sentencing Guidelines Range and Pre-Sentence Report

In the plea agreement, the parties stipulated to a United States Sentencing Guidelines ("Guidelines") offense level of 24 and Criminal History Category I. Based on this calculation, the stipulated advisory Guidelines range is 51-63 months' imprisonment. The calculation contained in the Presentence Investigation Report ("PSR") accurately mirrors the Guidelines calculation contained in the plea agreement.

The Probation Office recommends that the Court apply a downward variance to the advisory Guidelines range and impose a sentence of 36 months' imprisonment. It's recommendation for an extremely modest downward variance is based on Mr. Kolfage's lack of criminal history, military service, familial responsibilities, and that his likelihood of recidivism is low. Notably, it does not recommend that the Court vary based on 18 U.S.C. § 3553(a)(2)(D)'s sentencing factor that requires the court to consider the need to provide Mr. Kolfage with medical care in the most effective manner. As more fully addressed below, the required medical care for Mr. Kolfage's daily routine cannot be understated. His current medical needs are managed by a combination of medications, including narcotics, and mobility technologies that make his days less painful, manageable, and allow him to be an involved father and husband. He requires a medical aid with the appropriate training to handle his needs for most of the day. For example, while Mr. Kolfage has been fitted for prosthetics for both legs and his right arm, his use of them is nothing short of remarkable. People with his level of amputation do not usually use prosthetics. His leg prosthetics can only be used in very limited conditions based on environmental conditions. He cannot transfer himself from his wheelchair to the bath or bed with or without the use of prosthetics – that requires the assistance of an aid.

The Probation Office likely does not identify this as a variance factor because the BOP has given it an assurance that the BOP can care for Mr. Kolfage. However, this Court and the Probation Department are intimately familiar with the shortcomings of the BOP as it relates to caring for inmates. Before the Pandemic, internal investigations established that the BOP struggled to provide adequate medical care for inmates and the Pandemic only exacerbated those problems leading to countless grants of compassionate release for those at risk of suffering serious harm if they were to remain in custody.

A prison sentence for Mr. Kolfage is a bet against the odds. There are few organizations capable of providing Mr. Kolfage with the appropriate daily care, medications, and medical oversight in a way appropriate for the seriousness of his disabilities. The level of care he needs is unparalleled. The PSR does not address how the BOP will provide Mr. Kolfage with daily caregivers, someone to help him get in and out of his wheelchair, treatment for the stabbing pains

he often experiences in his extremities at night (the extremely debilitating phantom limb pain that many amputees experience). Likewise, the PSR fails to acknowledge that the daily medications that Mr. Kolfage relies on are not normally given in the BOP setting until / if approved after a full evaluation in a hospital setting, a process that could take months, months during which Mr. Kolfage would not be receiving the medication he needs to make it through each day in the face of his debilitating and constant pain.

There is no doubt that he will need special accommodations from the Bureau of Prisons that struggles to provide basic care to its vast population. He has been deemed totally disabled by the Veterans Administration because of his loss of three limbs, however, he has also been deemed partially disabled for the partial amputation and repair of his left thumb and shrapnel fragments still in his body that cause pain, fatigue, and coordination issues. Furthermore, as a result of his injuries and surgeries, he now suffers from severe and at times debilitating Irritable Bowel Syndrome ("IBS").

Accordingly, while we agree with Probation that a downward variance is warranted, we respectfully submit that the appropriate sentence for Mr. Kolfage is home incarceration and an increased term of Supervised Release.

**II.      Home Incarceration is Sufficient to Achieve the Goals of Sentencing and Appropriately Factors His History and Characteristics, Role in the Offense, the Sentences of Similarly Situated Defendants, and the Need to Provide Mr. Kolfage with the Unprecedented Needed Medical Care in the Most Effective Way**

Home incarceration is sufficient, but not greater than necessary to achieve the goals of sentencing. For this forty-one-year-old totally disabled father to two young children whose crimes are clearly aberrant behavior in an otherwise remarkable and law-abiding life, home incarceration is appropriate. Home incarceration appropriately balances the seriousness of the offenses for which Mr. Kolfage has acknowledged and accepted responsibility against his life circumstances, role in the offense, substantial medical needs, and the sentences of other defendants in this Circuit convicted of similar offenses.

   1. Mr. Kolfage's History and Characteristics Favor a Downward Variance

The offenses to which Mr. Kolfage pled guilty are serious. He regrets and is remorseful for his involvement, and he accepts responsibility as indicated by his plea and allocution. However, Mr. Kolfage's offenses represent much less than the sum of his history and character. Accordingly, his history and character weigh in favor of a downward variance. A sentence of incarceration would not serve to rehabilitate Mr. Kolfage but would rather have a deleterious effect on his physical health and mental well-being.

The PSR accurately recounts Mr. Kolfage's history and characteristics. *See* PSR at ¶¶104-157. Accordingly, the defense will attempt to be brief in restating Mr. Kolfage's biography, and rather, attempt to highlight points that are indicative of his true character. Mr. Kolfage is forty-one-years-old. He has been married to his wife Ashley for approximately twelve years. They share two minor children, a daughter (age nine) and a son (age seven). He is the product of a broken home, bouncing back and forth between his parents and separated by 4,000 miles during

his formative years. It is no wonder Mr. Kolfage found himself making poor decisions as a young adult. All the while, Mr. Kolfage was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), struggled in school and eventually dropped out. Despite earning his General Equivalency Diploma, Mr. Kolfage recognized his life was heading in the wrong direction and he took it upon himself to make a positive change. As more fully described below, he voluntarily enlisted in the United States Air Force in January 2001. He was deployed to Kuwait in February 2003 for the buildup to the Iraq invasion and was among the first solders to enter Iraq as a member of the 13 airmen Air Force ground unit. He volunteered to return to Iraq at his first opportunity in August 2004, and was struck with a mortar during an attack on September 11, 2004. Mr. Kolfage is among the most injured airmen in United States history to survive, leaving his legs and right hand behind on the battlefield.

Testament to his bravery and exemplary service, Mr. Kolfage has earned fourteen military commendations. Aside from the Purple Heart, Mr. Kolfage's military awards and commendations pertain to his actions and achievements, not his injury. He has earned the following military medals and commendations:

- The Purple Heart Medal;
- Air Force Commendation Medal;
- Air Force Achievement Medal with Valor dated January 13, 2004;
- Air Force Outstanding Unit Award with Valor;
- Air Force Good Conduct Medal;
- National Defense Service Medal;
- Armed Forces Expeditionary Medal;
- Iraq Campaign Medal;
- Global War on Terrorism Expeditionary Medal;
- Global War on Terrorism Service Medal;
- Air Force Longevity Service Award Ribbon;
- Small Arms Expert Marksmanship Ribbon;
- Air Force Training Ribbon; and
- Department of Defense Employee with a Disability Finalist.

*See* PSR at ¶¶ 144-145.

After his military service and military employment, Mr. Kolfage attended Pima Community College in 2008, and transferred to the University of Arizona, earning his Bachelor of Architecture degree in 2014. Laura Friedman, Mr. Kolfage's physical therapist from Walter Reed Army Medical Center, writes, "SrA Kolfage went on to college graduation with a degree in Architecture first in his class with his non-dominant hand." *See* Letters of Support Annexed Hereto as Exhibit "A." The people that know Mr. Kolfage today would not be surprised by the fact he graduated first in his class. Albion J. Giordano, Esq., Veteran's Advocate and Co-Founder of the Wounded Warrior Project, writes:

> None of us now how we will act should we be horrifically injured or dealt a life changing setback, but Brian Kolfage has set the standard on how to overcome adversity and continue to thrive.

4

*Id.*

Mr. Kolfage has received the following academic and other awards and honors subsequent to his military service:

- Phi Theta Kappa International Honor Society Induction;
- The National Society of Collegiate Scholars Induction;
- Pat Tillman Scholar Award;
- Wounded Warrior Project – George C. Lang Award; and
- Turning Point USA, Patriot of the Year.

*See* PSR at ¶ 145.

## Military History

Although he would not describe himself as such, it would be a disservice to Mr. Kolfage if he were described as anything less than a national hero. Mr. Kolfage enlisted in the United States Air Force on January 27, 2001. He completed basic training and three additional months for security forces technical training. During his service, Mr. Kolfage was exposed to horrific conditions and toxins including depleted uranium, blood parasites, sulfur gas, sulfur dioxide, human waste, burning feces and waste, deceased animals and humans alike.

His first deployment was to Kuwait in February 2003, to prepare for the first invasion of Iraq. Mr. Kolfage volunteered for assignment to a thirteen-man team to enter Iraq during the invasion to escort jet fuel, bombs and supplies to the air base the United States was securing. Mr. Kolfage and his team were among the very first ground units to enter Iraq. During this invasion, Mr. Kolfage was exposed to the perils of war. He observed people suffering – running and screaming in fear, begging for water, civilization on fire. Others attacked. Mr. Kolfage slept in bombed-out buildings and under vehicles. His mission was successful, and he returned to Kuwait. While on the base in Kuwait, Mr. Kolfage regularly wore Chemical Warfare Ensemble, slept in gas masks and lived in constant fear. He was providing security for 10,000 coalition troops and several billion dollars worth of equipment. He was subject to repeated Iraqi SCUD missile warnings and attacks. Notably, Mr. Kolfage responded to an attempted suicide on base, where a military member slit both wrists. His efforts contributed to saving the man's life. *See* PSR at ¶ 135.

His second deployment proved almost fatal. Mr. Kolfage was sent back to Kuwait in August 2004. A mission was scheduled to begin in Balad, Iraq. Valentin Cortez, an Air Force veteran who served with Mr. Kolfage recounts:

> The following year, our 13 man team deployed to Camp Arifjan, Kuwait. When Brian hear that only I had been selected to deploy back in to Iraq, he made it his mission to get on that team, so that I would not go back in by myself. Ironically, which he actually laughs about now, he got on the Iraq team by scaring one of the other selected member that he should not go, because he would end up getting blown up. He did get on that team, knowing the danger, without hesitation, for a young Mexican-American kid from Yuma, AZ.

*See* Exhibit A.

Mr. Kolfage did in fact take the place of the young airman whose wife was about to give birth. The airman expressed trepidation about being chosen, and Mr. Kolfage volunteered to take his place – for a mission to "Mortar-ritaville" – the exact opposite of Jimmy Buffett's dream. After a combat landing onto the base, the nickname made all too much sense. The base took fire daily; an incessant barrage of bombings and attacks. Iraqi forces amplified their fusillade on the three-year anniversary of September 11, 2001.

On September 11, 2004, while attempting to get a bottle of water, a rocket landed mere feet from Mr. Kolfage. His body was mangled by the blast. His ears were ringing. A mouth full of sand. He thought he was hallucinating from malaria medicine. Seconds went by before Mr. Kolfage saw his right-hand dangling from his wrist. His left hand was mutilated. The unquenchable thirst of imminent death set in. Several of his friends, including Mr. Cortez, rushed to his aid. They began triage. Mr. Kolfage saw them drenched in blood that he realized to be his own. He saw that his legs were gone. Every nerve in his body burned as his friends lifted what they could of him to a gurney and carried him to the medical tent. Mr. Kolfage lost consciousness after seeing horror in the doctors' faces. Quite frankly, Mr. Kolfage should have died. At one point, they believed his death was imminent, and Mr. Kolfage was awarded the Purple Heart while still breathing. It is nothing short of a miracle the doctors were able to stabilize Mr. Kolfage for evacuation to Walter Reed National Military Center.



As a result of his injuries, Mr. Kolfage suffered the loss of both legs, his right hand, part of his right forearm, and has had to have his left hand reconstructed. A left thumb was fabricated from parts of his hip bone. He suffers phantom pain from the loss of his lower extremities. Mr. Kolfage underwent the removal of a large section of his intestine, a colostomy, and a reverse colostomy. He has shrapnel permanently lodged in his right arm and back causing constant pain. Mr. Kolfage has undergone countless surgeries including nearly twenty in the first two weeks following his initial injury.

Laura Friedman writes:

> One really gets to know the patient well and at their most vulnerable state. One can tell a lot about a person's character by how they handle their rehabilitation phase. What I know about SrA Kolfage, he is a dedicated, hard-working, loyal, and funny individual. One thing that really stood out from many of the patients is the he never complained. Not once, even from the ICU days and he had plenty of reasons to [complain]…

*Id*. Even right after his injury, Mr. Kolfage never stopped fighting for others. Recalling the circumstances of assisting Mr. Kolfage while under attack, Mr. Cortez writes, "[f]or years, Brian fought for and eventually had the miliary award me the Bronze Star with Valor, for my actions on that fateful day." *Id.*

## Volunteer Work

Mr. Kolfage has dedicated a significant part of his post-military life to volunteering his time and energy. Daily life is daunting for him. Despite his constant physical and emotional struggles, Mr. Kolfage is thankful to be alive and believes in sharing his message of perseverance and overcoming obstacles. Hawaii State Representative Robert McDermott writes:

> I can attest to his remarkably patriotic character and his integrity based on numerous close contacts and working with him in stressful situations […]. I saw him up close. He's a good man, no doubt. Good men do make mistakes […]. Let me suggest you order him to share his story [not just his military but the circumstances of this case and atonement for criminal act] with school and youth groups, AA, and other folks who need hope. I have seen his inspiring speeches with power point, detailing his struggle and recovery. **It is inspiring**. He will be giving hope to the hopeless and making a positive impact on society. Please, no jail for Brian.

*Id.* (Emphasis in original).

From 2009-2011, Mr. Kolfage was an active member of Congresswoman Gabrielle Giffords' Veteran Advisory Committee. They shared regular telephonic calls and visits to Veterans' Administration ("VA") hospitals. Through Congresswoman Giffords, Mr. Kolfage met with the VA Secretary to discuss improvement of services. Mr. Kolfage participated in her campaign, including a commercial which ran in the days leading up to her election. Congresswoman Giffords is quoted in TIME magazine in response to a question regarding her inspiration as she worked toward her own recovery, "[o]ur veterans who fight every day to recover from their injuries. My friends Jimmy Hatch and Brian Kolfage inspire me. They were injured in Afghanistan and Iraq." https://content.time.com/time/nation/article/0,8599,2102334,00.html. Mr. Kolfage assisted Congressman Ron Barber with his campaign and served on his Veterans Advisory Committee as well. Mr. Kolfage serves as an ambassador to the Carrington Charitable Foundation, supporting their mission to assist wounded veterans and their families.

The United States Air Force and Marines have invited and hosted Mr. Kolfage as a motivational speaker. He has visited wounded U.S. troops in Germany who are fresh from the battlefield and struggling. Over the years, Mr. Kolfage made numerous trips to Walter Reed to visit and inspire

7

wounded soldiers facing their new realities.  One in particular, Sgt. Carlos "Manny" Evans, lost both legs and a hand after he stepped on an improvised explosive device ("IED").  Mr. Kolfage helped Sergeant Evans through his healing journey, facing Post Traumatic Stress Disorder, depression and addiction.  Sergeant Evans recently wrote a book, <u>Standing Together</u>, detailing his struggle and finding ways to turn devastation into blessing.  Therein, Sgt. Evans describes looking at Brian and silently asking God to give him the courage and faith to hang in there the way Brian did.  He explains that Brian's example gave him hope.  He writes, "If Brian can do this, I can too."  Sergeant Evans started his own organization, Touching Lives Leaving Footprints, with a mission to help other veterans in need.

One story of particular import, however, is not related to service to veterans.  It is the story of Mykola.  In 2015, Mykola, an eleven-year-old Ukrainian boy, was playing with his brother and friends when they found a Russian rocket propelled grenade ("RPG") left from a previous invasion.  Mykola did not know exactly what it was.  He began to run with it in his arms and tripped.  The RPG exploded and killed his brother.  Mykola lost both of his legs and his right hand.  A Canadian mission transferred Mykola to Shriners hospital in Montreal where somebody had shown him a picture of Mr. Kolfage to use as inspiration.  Mr. Kolfage had the opportunity to meet Mykola in person at Shriners, which he seized upon.  *See* Air Force Magazine, October/November 2017 Annexed Hereto as Exhibit "B".





Notably, Mr. Kolfage is a recipient of the Wounded Warrior Project – George C. Lang Award. Mr. Lang was a Congressional Medal of Honor recipient and was awarded for his service to other disabled veterans. Albion J. Giordano, Esq., writes:

> As Brian sits before you for sentencing, I wanted you to know this man has been a rock for so many wounded and injured service members, his commitment to not give up or give in to his disabilities has motivated countless warriors to do the same. He is generous with his time, never complains about his circumstances and always looks forward, not reliving the past.

*See* Exhibit A.

## **Family**

Although Mr. Kolfage relies heavily on his family for physical assistance, they rely on him for the support only a husband and father can give. His nine-year-old daughter is currently struggling with ADHD and severe anxiety. She frustrates easily and has trouble managing such frustration and emotion in an age-appropriate manner. Her anxiety is triggered by separation from her parents. Although she is close with her mother, Mr. Kolfage is uniquely able to calm his daughter better than others. Routine aids in managing outbursts. Mr. Kolfage provides the consistency in the home environment that allows his daughter to best cope with her condition. To date, her doctors are yet to determine a specific medication plan, and she undergoes regular evaluation at the Hattiesburg Clinic in Mississippi. She would suffer tremendously if Mr. Kolfage were sentenced to any term of incarceration.

Danya Feltzin, a friend of Mr. Kolfage for twenty-five years, writes:

> Brian is genuinely a good man, he is a dedicated husband, supportive father, and reliable friend. He has been there to help lift me up after a troubled marriage, he has always been there when I needed it most. I've witnessed Brian going above and beyond to help those around him and others that he doesn't even know now

> so many times…I would also like to point out that Brian and I do not always share the same political views, and even though I know he can be outspoken, it has never come between our friendship. I know in my heart that he believes he is doing what is best for the country and the future of our children.

*Id.*

A consideration of Mr. Kolfage's history and characteristics reveals that he is a remarkable human being. He has overcome unimaginable obstacles and remains positive throughout. This case marks his first and last brush with the law and he has returned to a law-abiding and honorable life. Accordingly, Mr. Kolfage's history and characteristics support a sentence of home incarceration.

   2. <u>If Imprisoned, Mr. Kolfage Will Not Receive Adequate Medical Treatment for His Numerous Physical Conditions</u>

Mr. Kolfage's medical needs are extensive and require a medical assistant to care for him daily. He cannot perform nearly all of his daily care facilities without the aid of a medical assistant. The only reason he is able to perform some of his daily activities is the incredible technological advances that have been provided to him by numerous charities and individuals like the Gary Sinise Foundation and Segway, who built him a special wheelchair.

He requires frequent care from physicians and pain management professionals. He suffers debilitating phantom limb pain due to the loss of three of his four limbs. He describes the pain like "someone stabbing my legs." PSR at paragraph 124. He suffers from severe Irritable Bowl Syndrome ("IBS"), the onset of which was the result of the Colostomy reversal to allow him to live without the use of a colostomy bag. In addition to his constant physical pain including nerve pain, sciatica, arthritis and IBS, he suffers from high blood pressure and high cholesterol. And very significantly, like all amputees, his body cannot regulate his body temperature. He takes several medications to manage his various ailments, including:

1. Buprenorphine (a narcotic used to treat his pain);
2. Gabapentin (to treat his nerve pain);
3. Celecoxib (for acute pain and inflammation);
4. Methadone HCL (for severe pain); and
5. Losartan (for high blood pressure).

Mr. Kolfage's home was specially designed and donated by the Gary Sinise foundation. Even with that home, he requires a medical assistant most of the day. His wife was trained through the VA's Caregiver Program to provide his needed care. Without her he would need a full-time nurse. His shower was designed for him to be able to independently shower. Showers are the most dangerous places for people with disabilities. Without his specially designed shower he would need to be given sponge baths. Balance is a major concern since his entire left leg is gone and he only has three inches of femur on the right. The slightest off-balance adjustment could cause severe injuries when in a slippery wet shower environment.

10

His home is also temperature controlled.  A major problem amputees face is the ability to control their internal body temperatures due to the loss of skin.  His home is built with a smart system that gives him the ability to adjust room temperatures instantly.  Some people look at this as a luxury item, however, it is an item of necessity for people who have lost 50%+ of their body and cannot regulate their body temperatures.

Mr. Kolfage has been fitted for the use of prosthetics to compensate for his multiple amputations.  Of course, prosthetics can tremendously increase an amputee's independence.  However, for his level of disability, his prosthetics do not.  Even in his specially designed home, he can only use his prosthetics sparingly.  They help him, but also pose a serious danger.  In the custody of the BOP he would not be able to use his prosthetics at all.

If this Court were to sentence Mr. Kolfage to a period of imprisonment, even before the onset of the COVID-19 global pandemic that has extraordinarily limited the resources and the ability for the BOP to provide adequate medical treatments to inmates, the BOP would have been hard pressed to meet his medical needs.  The BOP has proven unable to provide effective medical care for people like Mr. Kolfage even in ordinary times.

In 2016, DOJ's Office of Inspector General ("OIG") found that the BOP experienced chronic medical staffing shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions.  *See, e.g.*, U.S. Dep't of Justice Office of the Inspector Gen., Review of the Federal Bureau of Prisons' Medical Staffing Challenges i-ii, 1-2 (Mar. 2016), available at https://www.oversight.gov/sites/default/files/oig-reports/e1602.pdf.  From 2010 to 2014, the BOP's total medical staff was "approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal care,' and 12 institutions were so medically understaffed that they were described as 'crisis level.'"  *Id.* at 1.

Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards and has made wait times for individuals to receive even routine medical care unacceptably long.  *See* U.S. Dep't of Justice, Office of the Inspector Gen., The Impact of an Aging Inmate Population on the Federal Bureau of Prisons 17- 19 (Rev. Feb. 2016), https://www.oversight.gov/sites/default/files/oig-reports/e1505.pdf ("Aging Inmate Population"); *See also* Keegan Hamilton, Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits, Vice News (Mar. 24, 2020), https://bit.ly/3eq7Rl7; *see also* Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. On the Judiciary, 115th Cong. 3-4 (2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2ZjlDeG.

As the Court is aware, the onset of the COVID-19 pandemic brought with it an incredible amount of compassionate release litigation centered around the BOP's ability to handle the medical needs of seriously ill or disabled inmates, including those inmates unable to care for themselves.  Therefore, an examination of compassionate release caselaw regarding disabled defendants is informative to determine if, after taking into consideration Mr. Kolfage's medical needs, he should or can be placed in a correctional setting.

In order to qualify for compassionate release, the Court needs to find that extraordinary and compelling reasons warrant release. Extraordinary and compelling reasons include if the defendant "suffers from a serious physical or medical condition that substantially diminishes her ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." 18 U.S.C.S. app. § 1B1.13. The BOP has their own internal guidance on when an inmate qualifies for compassionate release as well. Compassionate release pursuant to 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), section 3(b) ("Debilitated Medical Condition") provides that "consideration may be given to an inmate suffering from a debilitated medical condition if the inmate is: (1) completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or wheelchair; or (2) capable of only limited self-care and is confined to a bed or wheelchair more than 50% of waking hours." (U.S. Department of Justice, Federal Bureau of Prisons, Program Statement, OPI OGC/LCI, Number 5050.50, January 17, 2019, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), at https://www.bop.gov/policy/ progstat/ 5050_050_EN.pdf). "Although the policy statements and application notes are no longer applicable post-[*United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020)], they are instructive here." *Garavito-Garcia v. United States*, 544 F. Supp. 3d 484, 490 (S.D.N.Y. 2021).

"[A] defendant need not have lost all ability to provide self-care" to satisfy this criterion. *United States v. Ebbers*, 432 F. Supp. 3d 421 ,428 (S.D.N.Y. 2020). "[To qualify for compassionate release] the inmate is usually unable to provide care for himself and is not expected to recover from his particular affliction. *See, e.g.*, U.S.S.G. § 1B1.13 cmt. N.1(A)(ii); *United States v. Bellamy*, No. 15-165(8) (JRT/LIB), 2019 U.S. Dist. LEXIS at 6-7 (D. Minn. July 25, 2019). The relevant inquiry is whether the inmate will recover under the circumstances as they are. *See United States v. Romero*, No. EP-13-CR-01649-4-FM, 2020 U.S. Dist. LEXIS 9847 at *5 (W.D. Tex. Jan. 21, 2020) (holding that defendant, who was confined to a wheelchair from life-long polio and had recently "developed a mass on her left shoulder," suffered "from a severe medical condition where improvement or recovery is unlikely under current conditions")"; *United States v. Almontes*, No. 3:05-cr-58 (SRU), 2020 U.S. Dist. LEXIS 62524, at *13 (D. Conn. Apr. 9, 2020).

For example, in *United States v. Gluzman*, No. 7:96-cr-323 (LJL), 2020 U.S. Dist. LEXIS 131749 (S.D.N.Y. July 23, 2020), Rita Gluzman's "wheelchair-bound status," "left-sided motor deficit," "weakness to left-side extremities," "misjudgment in movement and balance," and loss of "depth perception" demonstrated that her capacity to sustain her own health had been significantly compromised. (Dkt. No. 112.) Ms. Gluzman reported an "inability to care properly for [her]self" and "frequently having to rely on help [from her] sick roommates to get dressed, to put stockings [on], [and] to hook up [her] oxygen machine[.]" (Dkt. No. 107, Exh. 33.) Additionally, the Court found it "highly pertinent" that her conditions "require frequent monitoring, evaluation, and treatment." *Id.* (*quoting United States v. McGraw,* No. 02-cr-00018-LJM-CMM-01, 2019 U.S. Dist. LEXIS 78370 at *10 (S.D. Ind. May 9, 2019). The Court in *Gluzman* did not need to be given a litany of the daily self-care activities that Ms. Gluzman was unable to accomplish for it to reach its decision either. "The Court reaches its finding of substantial diminution in ability to provide self-care based on the medical evidence." *Id.* at *47-48 (c*iting United States v. Perez*, 451 F. Supp. 3d 288 (S.D.N.Y. Apr. 1, 2020) (finding that "recent surgeries, . . . persistent pain[,] and vision complications . . . satisfy that requirement").

12

Mr. Kolfage, given his extensive infirmities and that he is confined to a wheelchair, would *have* to be designated to a medical facility.  Deeply concerning is that the BOP, in response to Probation's inquiry regarding its ability to care from Mr. Kolfage's medical needs, reportedly responded that it "could accommodate the defendants' medical needs and that he would *likely* [not definitely] be placed in a medical facility."

Judge Caproni echoed these concerns in the sentencing of a wheelchair confined defendant who was a Guidelines Criminal History Category VI and alleged to have possessed a firearm in relation to narcotics offense, facing an advisory Sentencing Guidelines range greater than ten years.[1]  *See United States v. Wilbright*, 20 Cr. 667 (VEC) Sentencing Transcript.  Judge Caproni varied downward substantially and increased Mr. Wilbright's term of Supervised Release.  *Id.* at 12-13.  Specifically, Judge Caproni stated, "I've considered the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  This, Mr. Wilbright is a substantial factor to me.  You're almost 50 years old and you're also on social security disability."  *Id.* at 12.  "The defendant has substantial health issues and limited mobility."  *Id.* at 13.  "My sentencing is going to vary downward from the guidelines in terms of incarceration but go up from the guidelines in terms of supervised release."  *Id.*

Sentencing Mr. Kolfage to a BOP medical facility would not ensure that he is provided the needed medical care in the most effective manner and sentencing him to home incarceration does not amount to a free pass for him.  It appropriately acknowledges that the BOP, in fact most non-hospital medical facilities, are not equipped to handle Mr. Kolfage's medical needs in the most effective manner.[2]  And those that can only do so at great expense.  Accordingly, Mr. Kolfage's extensive medical needs also factor in favor of a sentence of home incarceration.

### 3. Mr. Kolfage's Role in We Build the Wall Favors a Variance

During the We Build the Wall campaign, any casual observer would have concluded that Mr. Kolfage was the organizer and leader of the campaign.  However, the government's investigation into the operations of We Build the Wall established otherwise.  Certainly Mr. Kolfage was an integral member of the campaign, especially before the involvement of the non-profit, however, counsel, Steve Bannon, and others were truly the decision makers and Mr. Kolfage was the symbolic leader.

Mr. Kolfage has been very politically active.  He is as patriotic as they come.  His political beliefs, whether you agree with them or not, are driven by his love for this country.  After all, his sacrifice for this country was tremendous.  And to have suffered his injuries on September 11, 2004, only three years after the deadly attacks on WTC and the attempt on the Pentagon, serve as a yearly reminder what he was fighting for.  And that backdrop, along with the divisiveness in the country over the border wall issue, caused him to start the Go Fund Me campaign at the heart of the case.  There were no complicated non-profits, ad campaigns, or visits to the border when

---

[1]  Judge Caproni also recognized that Mr. Wilbright's advisory Guidelines range was elevated due to the disparity between crack cocaine and powder cocaine.  However, she noted that his medical care was the substantial factor warranting her decision to vary.

[2]  In fact, even at the world-renowned Walter Reed Hospital, Mr. Kolfage's treatment and rehabilitation was a challenge.

13

he started the campaign.  His goal was as stated in the Go Fund Me campaign, raise money and give it to the government to help in the president's objective to build a border wall.

The campaign unexpectedly exploded, and he raised almost $20 million.  Mr. Kolfage had not planned it all out and his naivete showed in that he did not understand that he was not permitted to just give money to congress.  He could not donate the funds to the government and earmark them for a wall either.  All cash gifts to the United States government must go to the General Fund to pay down the national debt.  The Court may recall that at this time there was disagreement on the wall, but no one could figure out where the money would come from for any type of border wall.  Then the questions from Go Fund Me came and it became more complicated.  Mr. Kolfage discussed with Go Fund Me representatives the alternatives, such as donating the money to a designated charity, such as Shriners Hospital where he had met Mykola.  But because of the political nature of the campaign and that it raised so much money so quickly, it drew the interest of political heavyweights, including Steve Bannon.

Mr. Kolfage was connected to Mr. Bannon through a mutual acquaintance.  Mr. Kolfage traveled to Washington, D.C. to meet him, and that is when he met Mr. Badolato.  It was after these meetings that Mr. Kolfage agreed to participate in using the monies to fund a non-profit organization whose goal would be to build a border wall.  A team of lawyers took over.  "Within days of becoming involved, Bannon and Badolato took significant control of the fundraising campaign's organization and day-to-day activities, including the campaign's finances, messaging, donor outreach, and general operations."  PSR at paragraph 21.  Through lawyers with a relationship with Bannon, the machinations and complexities of setting up the non-profit was accomplished.  Brian was the front man, wheeled out to be the face of the campaign.  Mr. Badolato ran operations in the background.

Certainly, Brian participated and ultimately benefitted, but he made no material decisions.  He has pled guilty for his involvement in the conspiracy and deeply regrets his crimes.  However, his role in the management, organization, and true lack of leadership must be considered to fashion an appropriate sentence.  Therefore, we respectfully submit that his limited role in the organization's operations factors in favor of a downward variance.

   4. <u>Imprisonment for Mr. Kolfage Would Result in an Unwarranted Sentencing Disparity After Considering Sentencing Statistics and the Other Sentencing Factors</u>

When the court considers the available statistics compiled by the United States Sentencing Commission for all relevant defendants in the 2nd Circuit, the Court will conclude that a substantial variance is appropriate in this case.  Furthermore, after considering Mr. Kolfage's history and characteristics, including his disability and need for extensive medical care, we are confident that the Court will conclude that the appropriate sentence here is home incarceration.

The Sentencing Commission's statistics establish that, in the Second Circuit, for defendants with a Criminal History Category of I and sentenced under U.S.S.G. 2B1.1, the average sentence is 15 months' imprisonment.  The median sentence is 6 months' imprisonment.  And the percentage of defendants receiving 24 months' imprisonment or less is 79%.

14

There is no additional detail available from the Sentencing Commission, but we imagine that a miniscule percentage (if any) of the defendants suffered from Mr. Kolfage's medical infirmities and were in need of the type of medical care that he needs.

### III.     Conclusion

For all the foregoing reasons, it is respectfully requested that the Court sentence Mr. Kolfage to a term of home incarceration and increase the term under which Mr. Kolfage will be supervised by the Department of Probation because: (1) his history and characteristics establish that the offenses were aberrant behavior in an otherwise remarkable and law-abiding life; (2) The BOP is not equipped to adequately care for Mr. Kolfage; (3) the nature and circumstances of the offense establish that Mr. Kolfage participated and benefitted from the conspiracy, but he was not a leader, organizer, or decision maker; and (4) any sentence of imprisonment after considering the sentences of defendants with similar conduct and the other sentencing factors would result in an unwarranted sentencing disparity.

Respectfully submitted,

/s/

César de Castro
David DeStefano


cc:     Robert Sobelman
        Nicolas Roos
        Mollie Bracewell
        David Wikstrom
        Assistant United States Attorney (*via* ECF)