UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

UNITED STATES OF AMERICA      :
                         :

      - v. -               :
                         :      20 Cr. 412 (AT)

BRIAN KOLFAGE,           :
ANDREW BADOLATO, and     :
TIMOTHY SHEA,           :
                         :

           Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

UNITED STATES OF AMERICA      :
                         :

      - v. -               :
                         :      22 Cr. 201 (AT)

BRIAN KOLFAGE,           :
                         :

           Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING SUBMISSION


                                         DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York
                                         One St. Andrew's Plaza
                                         New York, New York 10007

Mollie Bracewell
Nicolas Roos
Robert B. Sobelman
Derek Wikstrom
Assistant United States Attorneys
   – *Of Counsel* –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    A. The We Build the Wall Fraud Scheme ......................................................... 2

    B. The Defendants' Convictions and Guidelines Calculations .............................. 7

    1. Kolfage's Guilty Pleas and Guidelines Range .................................................. 7

    2. Badolato's Guilty Plea and Guidelines Range .................................................. 9

    3. Shea's Trial Convictions and Guidelines Range .............................................. 9

ARGUMENT ....................................................................................................................... 12

  I. The Appropriate Sentences ........................................................................... 12

    A. Applicable Law ............................................................................................ 12

    B. Kolfage ........................................................................................................ 13

    1. Kolfage Should Be Sentenced to 51 Months' Imprisonment ....................... 13

    2. Kolfage's Request for a Sentence of Home Confinement Should Be Rejected .......... 25

    3. The Court Should Impose a Fine ................................................................... 31

    C. Badolato ...................................................................................................... 31

    1. Badolato Should Be Sentenced to 41 Months' Imprisonment ..................... 31

    D. Shea ............................................................................................................. 35

    1. The Applicable Guidelines Range is 108 to 135 Months' Imprisonment ................. 35

    2. Shea Should Be Sentenced to 63 Months' Imprisonment ............................ 37

CONCLUSION .................................................................................................................... 43

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendants Brian Kolfage, Andrew Badolato, and Timothy Shea, and in response to their respective sentencing submissions filed on April 12, 2023. Kolfage and Badolato pled guilty, and Shea was convicted after trial, for their participation in a scheme to defraud hundreds of thousands of donors to an online crowdfunding campaign known as "We Build the Wall" ("WBTW").

Kolfage pled guilty on April 21, 2022, to one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349. In a separate case, pursuant to Federal Rule of Criminal Procedure 20, Kolfage also pled guilty to two counts of making false statements on tax returns, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2, and an additional count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, with which he had been charged in the Northern District of Florida. The United States Probation Office (the "Probation Office") has calculated a range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 51 to 63 months' imprisonment.

Badolato pled guilty on April 21, 2022, to one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349. The Probation Office has calculated an applicable Guidelines range of 41 to 51 months' imprisonment.

Shea was convicted on October 28, 2022, after a one-week jury trial, of three counts: wire fraud conspiracy in violation of 18 U.S.C. § 1349, money laundering conspiracy in violation of 18 U.S.C. § 1956(h), and falsifying records in violation of 18 U.S.C. §§ 1519 and 2. The Probation Office has calculated an applicable Guidelines range of 108 to 135 months' imprisonment.

For the reasons explained below, sentences of 51 months' imprisonment for Kolfage, 41 months' imprisonment for Badolato, and 63 months' imprisonment for Shea, would each be sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

## BACKGROUND

### A. The We Build the Wall Fraud Scheme

In December 2018, Brian Kolfage and Timothy Shea hatched a plan: they decided to fundraise, nominally to build a wall on the southern border of the United States, in a scheme to make money for themselves. In mid-December, Kolfage texted Shea and his wife, Amanda Shea, "Let's create a gofundme to pay for the trump wall…And if trump doesn't take the money then we donate it to our organization." Shea almost immediately replied "Lol!!! That's so perfect!" He then explained to his wife, in the same text chain, "Amanda- trump can't take the money…so we could transfer it." (GX 1).[1] Less than a week later, they had created a GoFundMe page, "We The People Will Fund The Wall." (GX 301).

The GoFundMe page was an immediate success. Less than a month after it launched, the page had raised almost $20 million from hundreds of thousands of donors all across the country. (*See, e.g.*, Kolfage PSR ¶¶ 17-19; Tr. 74; GX 313). Thousands of the people who donated did so from the Southern District of New York. (GX 312). And by mid-2019, WBTW's GoFundMe campaign would be "the largest GoFundMe in the company's history." (Tr. 94).

But Kolfage and Shea's crowdfunding page also faced almost immediate difficulties. Within weeks, GoFundMe suspended the campaign because—as Kolfage and Shea knew and

---

[1] "Kolfage PSR" refers to the Presentence Investigation Report for Brian Kolfage, revised April 3, 2023; "Badolato PSR" refers to the Presentence Investigation Report for Andrew Badolato, revised April 3 2023; "Shea PSR" refers to the Presentence Investigation Report for Timothy Shea, revised April 3, 2023; "Dkt." refers to entries on the Court's docket in case number 20 Cr. 412; "Tr." refers to the transcript of the October 2022 Shea trial; "GX" refers to Government Exhibits received in evidence at the October 2022 Shea trial; "Kolfage Ltr." refers to Kolfage's sentencing letter dated April 12, 2023 (Dkt. 373); "Badolato Mem." refers to Badolato's sentencing memorandum dated April 12, 2023 (Dkt. 379 (redacted version, as corrected)); and "Shea Mem." refers to Shea's sentencing memorandum dated April 12, 2023 (Dkt. 372). Unless otherwise noted, case text quotations omit internal quotation marks, citations, alternations, and footnotes.

discussed from the outset (GX 1)—its purported objective to provide the money directly to the federal government was impossible. (Kolfage PSR ¶ 19; Tr. 70-73). GoFundMe warned Kolfage that he would have to identify a legitimate non-profit organization to which the funds he and Shea had raised could be transferred, or else the funds would be returned. (Kolfage PSR ¶ 19).

Kolfage turned to co-defendants Stephen Bannon[2] and Andrew Badolato for help. Within days of becoming involved, Bannon and Badolato took significant control of the campaign's organization and day-to-day activities, including the campaign's finances, messaging, donor outreach, and general operations. (Kolfage PSR ¶¶ 20-21).

In order to retain the millions of dollars they had raised, Kolfage, Bannon, Badolato, and Shea formed a non-profit entity, We Build the Wall, Inc., to receive the donated money and use it to privately build a southern border wall. (*See, e.g.*, Kolfage PSR ¶ 22; Tr. 74-76; GX 302; GX 306). Kolfage was the president and public face of the organization. (GX 352). Kolfage, Bannon, and Badolato, individually and through WBTW, repeatedly made representations to donors, regulators, and the general public to the effect that "100% of the funds raised on GoFundMe will be used in the execution of our mission and purpose," *i.e.* to build the wall, and that Kolfage would "personally not take a penny of compensation from these donations."[3] (*E.g.*, Kolfage PSR ¶¶ 17,

---

[2] The charges brought against Bannon in this case were dismissed after he was pardoned by then-President Trump.

[3] The PSRs attribute the extensive efforts to make these false public statements principally to Kolfage, Bannon, and Badolato. (*See* Kolfage PSR ¶ 37; Shea PSR ¶ 19; *but see* Shea PSR ¶ 20 ("Beginning in approximately January 2019, KOLFAGE, BANNON, BADOLATO, and **SHEA** caused We Build the Wall to mislead donors…[and] worked together to misappropriate hundreds of thousands of dollars of those funds for their own personal benefit")). The evidence at trial established that Shea knew about and was involved in the false statements as well. (*See, e.g.*, GX 23 (Shea asks Kolfage whether "we want this statement"—that "ALL PROCEEDS GO DIRECTLY TO BUILDING THE WALL"—"at the top" of a website; after Kolfage responds "I think since it can't be proven it's ok," Shea writes "K…I don't want to go to jail")). The evidence at trial proved that the statement was, in fact, false; the proceeds referenced in the statement were split between Kolfage and Shea, and none went to WBTW. (*See* GX 921).

24, 26-35; GX 306 (WBTW GoFundMe page); *see also, e.g.*, Tr. 83-84, 122-32, 448-49, 468-69, 482-84; GX 352). Bannon and Badolato recognized the importance of these lies, discussing that Kolfage's phony selflessness would generate "the most talked about media narrative ever," and would cause people to regard Kolfage as a "saint." (*E.g.*, Kolfage PSR ¶ 32; GX 16; GX 19).

At Shea's trial, multiple victims testified that these false promises were material. Victims reported that the defendants' representations influenced the victims' decisions to donate to WBTW, and that they would not have donated if they had known these promises were false. (Tr. 449-50, 469-70; *see also, e.g.*, Kolfage PSR ¶¶ 34-35). But, as discussed below, those representations were not true; the truth was that Kolfage, Bannon, Badolato, and Shea stole and pocketed hundreds of thousands of dollars from WBTW.

While they were publicly promising that 100% of donated funds would go towards construction of a southern border wall, and that Kolfage would take no money, the defendants privately arranged to steal donor money to compensate Kolfage. Kolfage, Bannon, and Badolato secretly agreed that Kolfage would covertly be paid $100,000 up front, and then $20,000 monthly, from WBTW donor funds. (Kolfage PSR ¶ 38; GX 16; *see also, e.g.*, GX 26; GX 36; GX 109; GX 112).

And all four defendants took steps to effectuate that agreement. Bannon and Badolato, for their parts, arranged to route money from WBTW to a separate non-profit that Bannon controlled, Citizens of the American Republic ("COAR"), and then to Kolfage. Kolfage never worked for COAR—Bannon's entity was just an intermediary the defendants used to funnel money stolen from WBTW to Kolfage while concealing its original (fraudulent) source. (Kolfage PSR ¶¶ 40-41). And Kolfage wasn't the only beneficiary of the money fraudulently transferred from WBTW to

COAR—Bannon and Badolato kept some of the stolen money for themselves. (*See* Kolfage PSR ¶¶ 41-43; GX 900).

Shea, too, acted as a conduit for the transfer and concealment of stolen money from WBTW to Kolfage. After the launch of WBTW, Shea created a shell company called Ranch Property Marketing and Management ("RPMM"). (Kolfage PSR ¶¶ 46-48; Tr. 246-48; GX 501). Over a period of months, RPMM repeatedly received transfers from WBTW, and then kicked portions of those transfers back to Kolfage; on one occasion, Shea used his own bank account, rather than RPMM's account, as the intermediary account. (*See* GX 900; GX 901-C). And Kolfage and Shea took further steps to obscure the nature of these transfers of embezzled WBTW funds: they used fraudulent invoices and memo lines in checks and wire transfers to paper their intermediary kickback transactions. (*See, e.g.*, Kolfage PSR ¶¶ 48-49; GX 906-C; GX 906-E; GX 906-F; GX 906-H). One witness at Shea's trial, Charlie Ford, testified about an example of this. Ford's company, Vision Quest Solutions, provided security services to WBTW as a contractor. Shea was Ford's point of contact at WBTW, and Vision Quest sent WBTW an invoice for approximately $20,000. Shea then turned around and created a fraudulent invoice in the name of RPMM, for almost $50,000, and sent it to WBTW. (Tr. 405-11; GX 116A; GX 118A). Using the proceeds from that invoice, Shea paid Ford's invoice, paid a $20,000 kickback to Kolfage, and kept the remainder of the money for himself. (GX 901-H).

All told, Kolfage received more than $350,000 in donor funds from WBTW, all of which was passed to him indirectly after being laundered through COAR, RPMM, or other intermediaries by Bannon, Badolato, and Shea. Kolfage spent that money on personal expenses, including home renovations, boat payments, a luxury SUV, a golf cart, jewelry, cosmetic surgery, and personal tax payments and credit card debt. (Kolfage PSR ¶ 54). And Kolfage was not the only beneficiary of

this scheme. Bannon, Badolato, and Shea weren't mere conduits to Kolfage, they also stole hundreds of thousands of dollars from WBTW donors themselves. Bannon's non-profit organization, COAR, received more than $1,000,000 from WBTW, and kicked back only a percentage of that money to Kolfage. Shea and his shell company RPMM received hundreds of thousands of dollars from WBTW; Shea kicked about a quarter million dollars to Kolfage, but kept more than $180,000 of the stolen WBTW donor funds for himself. Just as Kolfage did, Bannon, Badolato, and Shea each spent the money they respectively stole from WBTW on personal expenses. (Shea PSR ¶¶ 51-53; GX 900). By design, none of these payments were ever disclosed to the public. As Kolfage remarked to Badolato, "as far as the public knows, no one is getting paid," and "salaries will never be disclosed." (Shea PSR ¶ 53 (cleaned up)).

By October 2019, the defendants had carried out the thefts described above, and the Government had begun a covert investigation into the scheme. That month, Kolfage, Bannon, Badolato, and Shea learned of the Government's investigation, when an employee of a financial institution at which WBTW had previously had an account received a grand jury subpoena and, not realizing disclosure was prohibited by law, disclosed it to an outside lawyer working for WBTW. (Kolfage PSR ¶ 58; Tr. 147-53, 305-15; GX 909). The defendants immediately began taking additional steps to conceal their fraud scheme. They removed false representations from WBTW's website, and added a statement that Kolfage would be paid a salary starting in January 2020. Kolfage and Badolato also began communicating via encrypted messaging applications. (Kolfage PSR ¶ 58). And Kolfage and Shea—realizing the risk the Government's investigation posed to them—sought to cover their tracks by creating backdated contracts to retroactively justify their theft of WBTW money and payment of kickbacks. Kolfage instructed Shea to "[g]et RPMM stuff ASAP." (GX 53). Then, they worked together to create and sign backdated contracts. Shea

and Kolfage created a backdated "vendor services agreement" between RPMM and WBTW, and they executed a backdated letter agreement purporting to memorialize an agreement between Kolfage and Shea regarding licensing of WBTW's donor list. (Kolfage PSR ¶ 59; Tr. 316-34; GX 127; GX 128; GX 129; GX 129A; GX 130; GX 130A; GX 907). Although these documents were created in October 2019, Kolfage and Shea dated them six months earlier, so that they would falsely appear to justify the prior payments.[4]

## B. The Defendants' Convictions and Guidelines Calculations

This case began with the filing of Indictment 20 Cr. 412 (AT) (the "Indictment") on August 17, 2020. The Indictment was unsealed on August 20, 2020, upon the defendants' arrests.

### 1. Kolfage's Guilty Pleas and Guidelines Range

On April 21, 2022, pursuant to a plea agreement, Kolfage pled guilty to Count One of the Indictment, which charged him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. He also pled guilty to all three counts of a separate indictment, originally filed in the Northern District of Florida, which was transferred to this District pursuant to Rule 20 and assigned case number 22 Cr. 201 (AT) (the "Florida Indictment"). Each of Counts One and Three of the Florida Indictment charged Kolfage with making false statements on tax returns, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2, and Count Two of the Florida Indictment charged Kolfage with wire fraud in violation of 18 U.S.C. §§ 1343 and 2.

---

[4] These facts had not been fully developed at the time of the Government's plea agreements with Kolfage and Badolato. Their stipulated Guidelines ranges, which the Government stands by for purposes of their sentencings, do not include enhancements for their obstructive conduct. At trial, Shea was convicted of falsification of records in violation of 18 U.S.C. § 1519, and he does receive a two-level increase for obstruction. (Shea PSR ¶ 82). The concealment conduct that Kolfage, Badolato, and Shea engaged in, however, is relevant, and should be considered under Section 3553(a) as to all three defendants.

Kolfage's plea agreement included a stipulation between the parties as to the application of the Guidelines. The parties stipulated to a total offense level of 24, which is a product of the Guidelines applicable to Count One of the Indictment. The base offense level is seven, *see* U.S.S.G. § 2B1.1(a)(1); a 16-level increase applies under U.S.S.G. § 2B1.1(b)(1)(I), because the loss amount attributable and reasonably foreseeable to Kolfage was between $1.5 million and $3.5 million; a two-level increase applies under U.S.S.G. §§ 2B1.1(b)(2)(A)(i) and (ii), because the offense involved ten or more victims and was committed through mass marketing; another two-level increase applies under U.S.S.G. § 2B1.1(b)(9)(A), because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable organization; and a three-level decrease applies under U.S.S.G. § 3E1.1 because of Kolfage's timely acceptance of responsibility. The parties stipulated that all three Counts of the Florida Indictment are grouped with Count One of the Indictment pursuant to U.S.S.G. § 3D1.2(d), because their offense levels are determined based on the total amount of loss, and that under U.S.S.G. § 3D1.3(b), the Guidelines for Count One of the Indictment applied (and the inclusion of the loss from the Florida Indictment in an aggregate total did not increase the offense level under U.S.S.G. § 2B1.1(b)(1)). The parties further stipulated that Kolfage has zero criminal history points and is in criminal history category I, and that the resulting Guidelines range is 51 to 63 months' imprisonment. The Probation Office's Guidelines calculation is the same. (Kolfage PSR ¶¶ 82-97, 166). The Probation Office recommends a sentence of 36 months' imprisonment, in a recommendation that balances Kolfage's personal characteristics, including his military service and injuries, against his role in the offense, including that "[h]e engaged in this sheme over a several year period with one goal in mind, enriching himself," and that he "attempted to conceal [his] illegal conduct," and that at the time of the offenses, Kolfage "was receiving a disability income, social security income, and had

been provided a free home" so he "was not using the funds to support himself or his wife or children, but rather to elevate his financial situation and spend money on material things that were not essential." (Kolfage PSR at 48-49).

### 2. Badolato's Guilty Plea and Guidelines Range

On April 21, 2022, pursuant to a plea agreement, Badolato pled guilty to Count One of the Indictment, which charged him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Badolato's plea agreement included a Guidelines stipulation. The parties stipulated to a total offense level of 22: a base offense level of seven, *see* U.S.S.G. § 2B1.1(a)(1); a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H), because the loss amount attributable and reasonably foreseeable to Badolato was between $550,000 and $1.5 million; a two-level increase under U.S.S.G. §§ 2B1.1(b)(2)(A)(i) and (ii), because the offense involved ten or more victims and was committed through mass marketing; another two-level increase under U.S.S.G. § 2B1.1(b)(9)(A), because the offense involved a misrepresentation that the defendant or a co-conspirator was acting on behalf of a charitable organization; and a three-level decrease under U.S.S.G. § 3E1.1 because of Badolato's timely acceptance of responsibility. The parties stipulated that Badolato has zero criminal history points and is in criminal history category I, and that the resulting Guidelines range is 41 to 51 months' imprisonment. The Probation Office's Guidelines calculation is the same. (Badolato PSR ¶¶ 72-88, 130). Citing Badolato's personal history and characteristics and his family support, as well as the needs to provide adequate punishment and promote respect for the law and deterrence, the Probation Office recommends a sentence of 30 months' imprisonment. (Badolato PSR at 34).

### 3. Shea's Trial Convictions and Guidelines Range

Also on April 21, 2022, Superseding Indictment S2 20 Cr. 412 (AT) (the "S2 Indictment") was filed against Shea. Shea went to trial on the S2 Indictment in May 2022, resulting in a mistrial.

In October 2022, Shea again went to trial on the S2 Indictment, and on October 28, 2022, a jury unanimously convicted him of all three counts: Count One of the S2 Indictment charged Shea with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; Count Two charged him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and Count Three charged him with falsifying records with the intent to impede, obstruct, or influence the investigation by the Government that led to the charges in this case, in violation of 18 U.S.C. §§ 1519 and 2.

Shea's offense level under the Guidelines is calculated as follows:

Count One

1. The Guideline applicable to Count One is U.S.S.G. § 2B1.1.

2. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(G), 16 levels are added because the loss amount attributable and reasonably foreseeable to the defendant was more than $1,500,000, but not more than $3,500,000.

4. Pursuant to U.S.S.G. §§ 2B1.1(b)(2)(A)(i) and (ii), two levels are added because the offense involved 10 or more victims and was committed through mass-marketing.

5. Pursuant to U.S.S.G. § 2B1.1(b)(9)(A), two levels are added because the offense involved a misrepresentation that the defendant or a co-conspirator whose conduct is attributable to the defendant pursuant to U.S.S.G. § 1B1.3(a)(1)(B) was acting on behalf of a charitable organization.

6. Accordingly, the total offense level for Count One is 27.

Count Two

7. The Guideline applicable to Count Two is U.S.S.G. § 2S1.1.

8. Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is 27, that is, the total offense level for Count One, the underlying offense from which the laundered funds were derived, because the defendant committed the underlying offense and the offense level for that offense can be determined.

9. Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), two levels are added because the defendant was convicted under 18 U.S.C. § 1956.

10. Accordingly, the total offense level for Count Two is 29.

<u>Count Three</u>

11. The Guideline applicable to Count Three is U.S.S.G. § 2J1.2.

12. Pursuant to U.S.S.G. § 2J1.2(c)(1), the total offense level is determined by applying U.S.S.G. § 2X1.3 to the underlying criminal offenses, because Count Three involved obstructing the investigation or prosecution of those criminal offenses, and because the application of U.S.S.G. § 2X1.3 to the underlying criminal offenses yields a total offense level greater than the base offense level of 14 that would otherwise apply pursuant to U.S.S.G. § 2J1.2(a).

13. Pursuant to U.S.S.G. § 2X1.3(a)(1), the base offense level for Count Three is 23, that is, six levels lower than the higher of the total offense levels for Counts One and Two.

<u>Grouping Analysis</u>

14. Pursuant to U.S.S.G. § 3D1.2(c), Counts One and Two are treating as a single group (the "Group") because Count One embodies conduct that is treated as an adjustment to the guideline applicable to Count Two.

15. Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the Group is 29 because it is the highest offense level of the Group.

16. Pursuant to U.S.S.G. § 3C1.1 Application Note 8, Count Three is also considered part of the Group and two offense levels are added to account for its addition, because the total offense level for Count Three is lower than that of the Group before its addition.

17. Accordingly, the total offense level for the Group is 31.

Shea has no criminal history points and is therefore in criminal history category I. The resulting Guidelines range is 108 to 135 months' imprisonment. The Probation Office agrees with this calculation. (Shea PSR ¶¶ 74-90, 137). Relying on the trial evidence that Shea recognized the illegality of his offense conduct while committing it, the fact that he "is responsible for losses to over 300,000 victims and had minimal regard for the effect his actions could have on those victims," and the seriousness and length of the offense conduct, balanced against Shea's personal

circumstances, the Probation Office recommends a sentence of 54 months' imprisonment. (Shea PSR at 32-33).

## ARGUMENT

### I. The Appropriate Sentences

The Government respectfully submits that the Court should impose sentences of 51 months' imprisonment on Kolfage, 41 months' imprisonment on Badolato, and 63 months' imprisonment on Shea. The three defendants are discussed, in turn, below.

#### A. Applicable Law

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)     to afford adequate deterrence for criminal conduct;
> (C)     to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  Kolfage

#### 1.  Kolfage Should Be Sentenced to 51 Months' Imprisonment

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including Kolfage's background, the nature and circumstances of his offenses, the need to avoid unwarranted sentencing disparities, and the importance of general and specific deterrence, a sentence of 51 months' imprisonment—the bottom of the applicable Guidelines range—would be sufficient but not greater than necessary to accomplish the purposes of sentencing.

*First*, the nature and seriousness of the offense and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Kolfage committed serious crimes. He wrongfully exploited the public platform he had developed as a result of the terrible injuries he suffered during his honorable military service. He used his carefully crafted public façade to steal from hundreds of thousands of individual donors who trusted him with their money. He lied to those donors, brazenly and repeatedly, in direct communications and in statements to the media. (GX 905). He told those lies in emails, social media posts and messages, in television interviews, and at live events to which he traveled throughout the United States—literally lying to the faces of those from whom he was stealing. Compounding his culpability, he then viciously and publicly attacked members of the press and public who questioned his trustworthiness or integrity, or drew attention to the suspicious circumstances surrounding his fundraising efforts. The wire fraud scheme was egregious, long-running, and multifaceted, and was designed to—and did—chiefly benefit Kolfage. (GX 900). It was then followed by an equally brazen tax fraud scheme in which

13

Kolfage repeatedly lied, under oath, to the IRS, in part to avoid paying taxes on his ill-gotten gains from the wire fraud scheme.

*Second*, the needs for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a sentence of 51 months' imprisonment. *See* 18 U.S.C. § 3553(a)(2)(A), (2)(B). "Considerations of…deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime." *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018). Kolfage's wire fraud and tax fraud schemes were both: they were highly lucrative, netting him an enormous sum of money, and they required two separate lengthy, complex, and resource-intensive investigations to uncover. Importantly, Kolfage did not commit the crimes for which he is being held accountable out of desperation, a need for money, or to pay off debts he had accrued; indeed, the money was not spent on necessities of any type, and it is undisputed that his income and assets separate from the scheme were adequate for him and his family to live a comfortable life. Rather, Kolfage committed these crimes out of greed, out of a desire to live a life of luxury, a life he could not afford through his legitimate income. He used the hundreds of thousands of dollars he embezzled to, among other things, renovate his home, fund cosmetic surgery for his wife,[5] and purchase a boat, a luxury SUV, a golf cart, and jewelry. (Kolfage PSR ¶ 54). Others who may contemplate engaging in fraud schemes like Kolfage's, as well the victims

---

[5] According to her Instagram page—which was active as recently as a few days ago, but which appears to have been taken down as of the date of this filing—Kolfage's wife is a "Fashion Model" and "Brand Influencer" who had over 1.1 million followers on Instagram. The Government is skeptical of Kolfage's claim that her income is merely $2,500 per month. (*See* PSR ¶ 158 & n.7). *See* Jade Scipioni, *Here's How Many Social Media Followers You Need To Make $100,000*, CNBC, Apr. 30, 2021, https://www.cnbc.com/2021/04/30/how-much-money-you-can-make-off-social-media-following-calculator.html ("An influencer with over a million followers [on Instagram] can reportedly make more than $250,000 per post from brands.").

of these crimes and members of the public, should be sent a clear message that such conduct will be dealt with harshly, particularly where a defendant uses fraud proceeds to fund an exotic lifestyle. The types of crimes Kolfage committed, the way in which he committed them, and the benefits he received from his crimes, as well as the public attention he brought upon himself in doing so, all support the conclusion that a sentence of 51 months' imprisonment is warranted for the purposes of promoting respect for the law and general deterrence. *See United States v. Watts*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023) (summary order) ("consideration of general deterrence is especially important in the crimes of the sort that this case involves," *i.e.*, wire fraud and money laundering); *United States v. Park*, 758 F.3d 193, 201 (2d Cir. 2014) ("[G]eneral deterrence occupies an especially important role in criminal tax offenses, as criminal tax prosecutions are relatively rare.").

*Third*, a substantial sentence is similarly necessary for specific deterrence. Although Kolfage has pled guilty and legally accepted responsibility for his conduct, he has, thus far, demonstrated no remorse or regret for actions and the victims of his schemes. His claim to be "regretful and remorseful" (Kolfage Ltr. 3) rings hollow in light of the way in which he has consistently conducted himself during the pendency of this case, up to and including certain aspects of his sentencing submission. For example, in his submission Kolfage claims that, when he began raising money for WBTW, "he did not understand that he was not permitted to just give money to congress" or "donate the funds to the government and earmark them for a wall." (Kolfage Ltr. 14). This is false, as the Court knows from the evidence adduced at Shea's trial. On December 12, 2018, *before* they launched the GoFundMe fundraiser, it was Kolfage who informed Shea—as they hatched their scheme—that "if trump [*i.e.*, the government] doesn't take the money then we donate it to our organization." (GX 1). Within minutes, Shea even confirmed as much:

"trump can't take the money…so we could transfer it." (*Id.*). Similarly, according to the notes of an interview with the Manhattan District Attorney's Office post-dating Kolfage's plea in this case, Kolfage claimed that "he never intentionally lied about not taking [money] from WBTW but at some point he realized what he had been doing was a crime."[6] The notion that Kolfage never intentionally lied, but simply came to "realize[]" at some point that he had committed a crime, suggests inadvertence that is difficult to reconcile with his guilty plea in this case. In any event, the suggestion that Kolfage (and Shea) began raising funds in good faith, for the purpose of donating 100% of it to the United States Government, is a demonstrably false narrative that Shea also unsuccessfully pushed at trial; the jury rejected it, and this Court should as well.

In addition to trying to revise the facts of his own criminal conduct, Kolfage's submission completely ignores his troubling conduct towards the Government, the Court, and the public during the pendency of this case. Despite Kolfage's best efforts to conceal his crimes, he got caught. He then went on a public offensive and tried to profit off the charges by raising money, likely from the same individuals whom he had victimized through his misuse of WBTW. Beginning on at least August 21, 2020, the day after Kolfage was arrested, he made a steady stream of public statements on his social media accounts about this case. In just the first week after his arrest, Kolfage made at least a dozen statements about this case on his Facebook account, which had more than 630,000 followers and could be viewed by anyone who visited his page. During that time period, Kolfage also streamed "live" videos featuring discussions critical of the case on his Facebook page. The statements typically contained expressions of opinion about the defendant's innocence and the

---

[6] The Government produced these notes to Kolfage on October 28, 2022, shortly after receiving them, and can provide them to the Court upon request.

merits of the case, among other subjects, and many of them were highly inflammatory. The
following is a sample of posts by Kolfage on his Facebook page from that time period.



Brian Kolfage ✓
August 21 at 11:17 AM · 🌐

The witch hunt is on! I'm not going to be bullied into being a political prisoner
for my beliefs. I have fought hard for these freedoms and the SDNY is on a
all out assault to take down every Trump insider from the 2016 election, that
means Bannon. They will ruin innocent peoples lives in order to have a war
trophy pinned to the wall just before elections.

I've obtained one the best super lawyers around who isn't afraid to fight back
at the politically motivated assaults against me. This is where the line of
freedom is drawn. If you allow the weaponized apparatus to win, we lose
freedom. They will go after anyone for anything they want, anytime.

They wont ever investigate their friends like the Clinton Foundation. They've
targeted Trump's inner circle- Flynn, stone, Manafort, Cohen and now
Bannon. If it walks like duck, quack likes a duck, its a duck. We cant let the
weaponized judicial system take anymore political prisoners.

FIGHT BACK!

👍😍😡 18K                                          4K Comments  4.9K Shares

17







Kolfage's inflammatory posts were, as he undoubtedly intended, amplified by media coverage of them. *See, e.g.*, Ben Feuerherd, *Accused Fraudster Brian Kolfage Rants Against Feds on Facebook*, N.Y. Post, Aug. 21, 2020, https://nypost.com/2020/08/21/accused-fraudster-brian-kolfage-rants-against-feds-on-facebook/.

18

Shortly after this Court granted Bannon's motion to dismiss in light of President Trump's pardon, Kolfage posted the following on social media calling for this case to be reassigned to a different judge and suggesting that this prosecution was somehow improper:

 **brian_kolfage_** The judge on the @webuildthewall case hasn't heard a single ounce of evidence but says bannon is guilty? WTF?! This is an outrageous over reach of political abuse by the SDNY again! One does not accept a pardon, it's awarded. She needs to be thrown off this case immediately for being biased. A pardon is a sign of injustice not guilt. #SDNY IS CORRUPT! #buildthewall #trump #trump2024 #maga #kag

 **brian_kolfage_** This is the same judge who just protected the Epstein prison guards

 **brian_kolfage_** @bthree19 when a pardon is given you sign nothing, you don't formally accept a thing. Yes I'm sure bannon could have fought it legally but why would he? The SDNY is weaponized and he is a war trophy. The pardon comes with a "stigma" of guilt but it's not an admission of any guilt. In this day an age (not 200 years ago which you cited from the judge) the DoJ is taking political prisoners and everyone understands why bannon was pardoned before the case even went under way.

Shortly after the United States Attorney's Office for the Northern District of Florida filed the tax fraud charges to which Kolfage later pled guilty before this Court, Kolfage posted the following on social media:



> brian_kolfage_ The SDNY and corrupt DOJ wants to force me to shut up and probably take a plea by bringing more bogus charges. NOT A CHANCE. These corrupt ass holes are coming for anyone who supported Trump at a high level. They want to shut us up and stop us from building more border wall. Meanwhile Hunter Biden is walking free because the DOJ is fully corrupted and bought by the ruling elite. Where is the fraud charges into the Clinton foundation? Thats why the Clintons live in NY now to

On October 21, 2021, Kolfage posted the following on social media:

> Brian_Kolfage 🅥 @… · 10/21/2021 ··
> You are now seeing the bogus charges from the SDNY on bannon and WBTW were 10000% politically motivated. Bannon is their war trophy.  We are officially a banana republic.

On April 7, 2022, after it was publicly reported that he planned to plead guilty, he posted on social media the following:



> 📌 Pinned Post
> Brian_Kolfage 🅥 … · 04/07/2022 ···
> They Michael Flynn'd me.
> 💬 18    👍 49    🔁 24    ↗

Around that same time, he made similar comments to the media. *See, e.g.*, Jim Thompson, *Brian Kolfage Agrees To Plead Guilty in 'We Build the Wall' Federal Fraud Case*, N.W. Fla. Daily

News, Apr. 11, 2022, https://www.nwfdailynews.com/story/news/courts/2022/04/11/kolfage-enters-plea-deal-build-the-wall-federal-charges-new-york-and-florida/9509759002/ ("Contacted via voice message and text message on Friday for comment, Kolfage did not return the voice message, but did respond with a cryptic text message on the plea agreement. 'They Michael Flynn'd me,' he wrote. Asked for clarification, Kolfage texted, 'That's all I can really say at the moment ...,' before going on to write that '... after it's all said and done, I'll give you a full interview.'").

Kolfage's outrageous posts did not cease with his guilty plea. On April 22, 2022, the day after his guilty plea, Kolfage posted on social media an article falsely claiming that "Democrats…Charged Him with Fraud and Tried to Destroy Him":



In addition to Kolfage's public messages attacking this case, the Government, and the Court—made both before and after he pled guilty—he launched and continues to operate a website seeking to profit off of false narratives and outlandish conspiracy theories about this case. The following are screenshots from fight4kolfage.com, a slick fundraising site which is still active and purports to have raised approximately $64,000.



**300**DAYS

The SDNY has cancelled hearing after hearing over the past 10 months as their case begins to fall apart. There has been ZERO movement. The entire case was for show. And because the 'wall' case is now falling apart to save face they brought bogus tax charges on Brian. The Biden admin is back to their dirty Obama tricks of weaponizing the IRS against conservatives. They are targeting Airman Brian Kolfage just like they did with General Flynn.

THEY TOOK KEY FACTS AND TWISTED THEM INTO CRIMES! WHEN IN FACT THEY WERE NOT! THEY MUST BE HELD ACCOUNTIBLE!

## WEAPONIZED LAWFARE

Brian Kolfage is the founder of We Build The Wall, inc which contributed towards 4 miles of privatized border wall to support President Trump's number one campaign promise to secure our borders. Brian has given 3 limbs to protect this nation and has constantly been targeted for his hard work of building the border wall! He's a gladiator who is constantly fighting for this nation, but now he needs you! These funds will help his family recover some of the massive financial burdens placed on them, just like we saw with General Flynn.

The Southern District of New York has become fully weaponized against Trump associates and filed politically tainted charges against Brian, Steve Bannon and 2 others.

Legal experts across the United States have labeled the case one hundred percent politically motivated and a disgusting abuse of our judicial process. Recently a federal judge on another case accused the SDNY prosecution of corruption and has called for a complete investigation into the corrupt actions of the SDNY.

### Indicted for items he owned long before 'We Build The Wall'... THEY LIED!

Clearly Brian wasn't "living a lavish life on donor funds". He had no problem buying these items before the campaign to build the wall. This is a textbook political hit job

# TARGET ACQUIRED

## Show me the man, I will find you the crime.

On Aug 20, 2020 just hours after getting Biden laptop data, the SDNY sent the USPIS to raid Bannon with search warrants for hard drives and data. It was Rudy Giuliani who is also being targeted by the SDNY who gave Bannon the info. Coincidence? Think not.



Kolfage's conduct has repeatedly established that he requires deterrence from further criminal conduct. And the extensive campaign against this case, the Court, and the Government recounted above is not taken into account by the Probation Office's recommendation of a sentence of 36 months' imprisonment. As a result, with all due respect to the Probation Office, their recommendation for Kolfage is insufficient to accomplish the purposes of sentencing here. In light of Kolfage's plain lack of remorse; the false narratives he is seeking to push upon the Court in his sentencing submission; his inflammatory and false public offensive against this case, the Government, and the Court; as well as his continuing effort to financially benefit from his lies, a

sentence of 51 months' imprisonment is necessary to ensure adequate specific deterrence from further abuses.

### 2. Kolfage's Request for a Sentence of Home Confinement Should Be Rejected

Seeking to avoid any prison sentence at all, Kolfage requests that the Court impose "home incarceration" for an unspecified period of time. Although Kolfage's physical condition is a mitigating circumstance, a sentence at the bottom of the applicable Guidelines range is sufficient to account for it. Indeed, the Government made a reasonable plea offer and is recommending a lenient sentence relative to Kolfage's conduct specifically because of the injuries Kolfage suffered while serving our country. But for Kolfage's physical condition and health circumstances, the Government likely would have sought a sentence at or above the top of the applicable Guidelines range. But Kolfage's injuries, while serious, are not a license to commit fraud with impunity. The extraordinarily lenient sentence he requests is not called for by the facts of this case, would fail to account for the seriousness of the conduct at issue and the damage done to the victims, and would not send the appropriate message to Kolfage, others similarly situated, the public, or the victims about Kolfage's criminal conduct. Indeed, Kolfage based this request on five premises, each of which is deeply flawed and which do not, either independently or collectively, justify the extraordinary leniency he requests.

*First*, Kolfage repeatedly attempts to pass off his criminal conduct as "aberrant behavior" (*See* Kolfage Ltr. 1, 2, 3, 15). Notably, his submission references only the donor funds he stole from WBTW and his false filings with the IRS related to those funds. Even if the Court accepted that artificially cramped view of Kolfage's crimes, he carried on his scheme to steal from WBTW and its donors and lie to the IRS about his income *for two years*. These crimes were not a momentary lapse in judgment, they were a sustained campaign of theft and self-dealing. Further, the scope of Kolfage's criminal conduct was broader than he acknowledges, and demonstrates a

significant willingness to lie for personal gain and disrespect for the law. At the same time Kolfage lied to donors and to GoFundMe in order to steal hundreds of thousands of dollars from WBTW, participated in a complex scheme to launder the stolen funds, obstructed the Government's investigation, and repeatedly lied under oath to the IRS about his income—including in December 1, 2020, after he was charged in this case—Kolfage also made numerous false statements to several financial institutions in connection with home equity and boat loan applications made between September 2018 and April 2019. To be clear, the lies that Kolfage told on the loan applications had nothing to do with his WBTW fraud scheme or his tax fraud scheme. Indeed, some of the false statements—made at least as early as September 2018—predated his launch of WBTW by several months. And those false statements were often accompanied by false documents that Kolfage created, including a fake letter purportedly signed by an employee of the United States Department of Veterans Affairs and fake bank and credit card documents showing made-up balances. Even ignoring that they continued for years, it is simply not the case that the WBTW fraud scheme and the tax fraud schemes collectively were some type of "aberrant behavior" or momentary lapse in judgment. Rather, Kolfage was already committing crimes by lying to financial institutions about his finances to obtain credit to which he was not entitled. (*See* Kolfage PSR ¶ 70). Unfortunately, the WBTW fraud scheme and the tax fraud scheme were not "aberrant behavior"—they were merely an escalation of Kolfage's longstanding and sustained willingness to lie, conceal, and commit crimes to enrich himself and live a more luxurious lifestyle.

*Second*, Kolfage argues that he should not be incarcerated because the Bureau of Prisons ("BOP"), he claims, "is not equipped to adequately care" for him. (Kolfage Ltr. 1). Kolfage's argument, however, is simply without a factual basis. The Probation Office "contacted the Bureau of Prisons and they have indicated they could accommodate [Kolfage's] medical needs and that

he would likely be placed in a medical facility." (Kolfage PSR at 48). The Government separately contacted the BOP with the same inquiry, to inform the Government's sentencing recommendation. After being provided the medical information that Kolfage reported to the Probation Office, Dr. Dianne Sommer, a Regional Medical Director with the BOP, issued a letter dated April 4, 2023, in which she explained that "the BOP will be able to provide appropriate care for Mr. Kolfage once committed to the custody of the BOP." (Ex. A (letter from BOP) at 3).[7] To be sure, Kolfage has suffered terrible injuries and is seriously and permanently physically disabled. However, Kolfage's self-reporting to the Probation Office and description of his physical limitations in his submission appear to purposely omit certain activities in which he is able to engage. For example, he is able to—and does—paddle board and surf (the Government can provide photographs of him doing so, obtained from public sources, to the Court upon request), pilot the boat he purchased with a fraudulently obtained loan, and travel. Indeed, during the schemes for which he is being sentenced, he frequently traveled by plane to locations throughout the United States and stayed in hotels, without any apparent medical assistance, for days at a time. In addition, despite his physical challenges, he was fully capable of orchestrating a nationwide, multimillion-dollar fraud scheme that victimized both hundreds of thousands of individual donors and the IRS.

As an alternative to incarceration, Kolfage requests that the Court sentence him to "home incarceration" for an unspecified period of time. This request effectively asks the Court to deem

---

[7] Kolfage, without citation to any authority or publication, speculates that he may not receive his prescribed medications for "months" after beginning a term of incarceration. (Kolfage Ltr. 3). This claim is not accurate. Dr. Sommer's letter explains that Kolfage would be able to bring his medications with him at the commencement of his incarceration, which would then be reconciled with the BOP's "extensive National Formulary" and, if needed, any "non-Formulary requests can usually be accomplished within 36 hours of the clinician's request." (Ex. A at 3).

his confinement to the luxury home that he has renovated at the expense of the victims in this case and with the use of a home equity loan he obtained by fraud. The Court should reject the notion that a defendant could engage in multiple fraud schemes, steal money from donors to a non-profit organization and fraudulently obtain a loan from a financial institution, spend that money to renovate his home to make it more luxurious, and then be permitted to use that home as a gilded cage in lieu of imprisonment. Kolfage's request is not only unsupported by the Section 3553(a) factors; on these facts, it is offensive.

*Third*, Kolfage suggests that a non-incarceratory sentence is appropriate because he "was not an organizer or decision maker" for WBTW and that "counsel, Steve Bannon, and others were truly the decision makers and Mr. Kolfage was the symbolic leader." (Kolfage Ltr. 1, 2, 13). With respect to WBTW's legitimate operations, Kolfage was, in fact, a front-man rather than the person making the more substantive decisions about how to spend funds—for example, where portions of the wall should be built. When it came to the fraud and money laundering scheme in which he participated, however, he was a central decisionmaker. Indeed, he appeared to care far more about how *he* was going to get his cut of the money than what was going to be done with the money not going into his pocket—that latter part, he was fine leaving to others' discretion. As the Court saw at Shea's trial, Kolfage schemed with Shea to determine the best way to fraudulently induce donors to hand over their money, brainstorming ways to siphon as much money for themselves without anyone noticing, and creating fake, backdated agreements to cover up their crimes. (GX 904). Kolfage was not a passive member or minor player in the wire fraud scheme—he was a key member and a driving force. Kolfage's self-serving statements in his sentencing submission should be identified and rejected for what they are: an unwarranted minimization of his role and a baseless attempt to shift blame to others for conduct about which he professes remorse.

*Fourth*, Kolfage relies on his personal accomplishments, volunteer work, character, and family life as grounds for leniency. (Kolfage Ltr. 2-10). It is, of course, appropriate for the Court to take account of Kolfage's personal accomplishments at sentencing. But Kolfage's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—people who, despite having extraordinary opportunities and a network of people who love and support them, nonetheless choose to steal and defraud. As Judge Marrero astutely observed, these sorts of arguments:

> [F]all[] into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. And as worshipers they are devout, often rising as leaders of the congregation.

> Yet, for all of their outward rectitude, these otherwise good people suffer a fatal flaw: they lead a double life. Somewhere at the core, in a distorted dimension of the soul, the public image they present is as false as the lies they tell to sustain the appearances of an exemplary life. And somehow, for reasons that always defy reason, they fall into crime, doing wrongful deeds that seem aberrational, selfish and greedy acts that, when caught, they claim are entirely out of character with their otherwise law-abiding lives.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010).

Kolfage, like the defendant in *Regensberg*, led a double life. He was a decorated veteran, gravely injured at war, who came home, got an education, developed a public profile, and built a family. Yet Kolfage also traded on these personal qualities to carry out his crimes. He defrauded hundreds of thousands of ordinary people in service of his own greed, and he used his military service, his injuries, his notoriety, and his good reputation to do it. Now, having committed a string of serious crimes, he is turning back to those very same personal qualities as he tries to avoid

accountability for his wrongdoing. The Court should not treat the personal characteristics that enabled Kolfage's crimes as a reason not to adequately punish him.

*Fifth*, Kolfage suggests that an incarceratory sentence somehow would result in an unwarranted sentencing disparity. (Kolfage Ltr. 2). Kolfage's argument involves some reliance on general statistics about sentences where fraud guidelines are employed, but no analysis that compares his case to those other cases in any way that can meaningfully impact the Court's decision in this case. What is apparent, however, is that, when compared with a more run-of-the-mill fraud case, there are several aggravating circumstances that make Kolfage deserving of a substantial incarceratory sentence: Kolfage acted not out of desperation or need, but out of greed and a sense of entitlement; Kolfage lived a life of luxury, and used the fraud proceeds to fund that lifestyle; Kolfage committed several different frauds and crimes, some of which were entirely unrelated to the others, rather than only one fraud or crime; Kolfage was investigated by two separate United States Attorney's Offices and sets of federal investigators, and was indicted in two different districts for distinct criminal conduct; Kolfage's victims included not only GoFundMe, financial institutions, and the IRS, but also hundreds of thousands of individual small-dollar donors who entrusted him with their money for a cause they believed in; Kolfage's lies to donors were brazenly public, repeated, and adamant; and after being charged and arrested, he immediately began an unceasing public offensive against the case, the Government, and the Court. Moreover, Kolfage is substantially more culpable than both of his remaining co-defendants, Badolato and Shea. Were it not for (a) Kolfage's physical condition and (b) Shea's additional counts of conviction and lack of acceptance of responsibility, the Government likely would have sought a sentence substantially higher for Kolfage than for Shea. In any event, it is difficult to imagine that imposing the sentence the Government requests—at the bottom of the Guidelines range, to account

for the significant mitigating circumstance of his physical condition—could possibly result in an unwarranted sentencing disparity. Rather, imposing the sentence Kolfage requests—not a day of incarceration, but instead confinement to his luxury waterfront home in Florida, which he renovated with fraud proceeds—is far more likely to create an unwarranted sentencing disparity.

### 3. The Court Should Impose a Fine

Based on Kolfage's self-reports about his own finances, the Probation Office concluded that Kolfage "has the ability to pay a fine" (Kolfage PSR ¶ 163) and recommended that the Court impose a fine at the low end of the applicable Guideline range of $20,000 to $200,000 (Kolfage PSR ¶ 183), that is, $20,000. (Kolfage PSR at 47, 50.) Such a fine is warranted given the significant profit Kolfage received from his crimes. He lined his pockets with money that was stolen from the donors and organization he committed to serving. Thus, the Government agrees with the Probation Office's analysis, and recommends that the Court impose a fine of $20,000.

### C. Badolato

#### 1. Badolato Should Be Sentenced to 41 Months' Imprisonment

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, Badolato's role in the scheme, the need for general and specific deterrence, and Badolato's early acceptance of responsibility, the Government submits that a sentence at the bottom of the Guidelines range—specifically 41 months' imprisonment—is sufficient but not greater than necessary to accomplish the purposes of sentencing.

The nature and circumstances of the offense warrant a Guidelines sentence. 18 U.S.C. § 3553(a)(1) and (2)(A). As Badolato admitted when he pleaded guilty, he "together with others, mutually decided to falsely claim that Mr. Kolfage, president of We Build the Wall, would not receive any compensation from We Build the Wall funds," and those false statements were made "to bolster the reputation of We Build the wall and, in turn, generate more donations." (Apr. 21,

2022 Plea Tr. at 46). The evidence at Shea's two trials established that this was not a one-time slip of the tongue, but rather a central part of an ongoing scheme to induce donors to part with millions of dollars. The trial evidence also established that there was an organized plan in place for paying kickbacks to Kolfage and other members of the conspiracy.

Badolato played a central role in the scheme. He got Kolfage to agree to publicly state he would not take any money in exchange for getting secret kickbacks. Badolato, for instance, texted Bannon on December 30, 2018, "got Brian [Kolfage] to agree" to represent to GoFundMe and the public that "He WILL NOT be paid a dime…But we gotta find an end around to get him stuff and something soon." Badolato and Bannon were, together, in charge of determining just how much money would be paid to Kolfage and other co-conspirators. Badolato, for example, told Bannon in January 2019 that they needed "give [Kolfage] slight fear of god that we approve slash your people['s] funds." Bannon texted back, "No deals I don't approve; and I pay Brian [Kolfage] so what's to worry." And in February 2019, referencing the prior agreement to pay him kickbacks, Kolfage texted Badolato, "We need to figure out my pay. We started everyone at dec 20th. Mine was $100k upfront then 20 month. How's it work for me." In short, Badolato worked on the kickback arrangement with Kolfage, ran it by Bannon, and helped to call the shots on what everyone would be paid.

Badolato was also central in ensuring that Kolfage was, in fact, paid the kickbacks, and in figuring out how to transfer the money to him. Badolato orchestrated the transfer of funds from WBTW to COAR, and from COAR to Kolfage. He prompted Bannon to make payments, sent instructions to Bannon's money manager, and dealt with Kolfage's requests to have his "COAR pay" made "all in [his] wife's name." In May 2019, it was Badolato who instructed Shea to "[s]end…bk 20k" from a $30,000 wire that went from WBTW to Shea. Badolato also received

Shea's fabricated invoices in July and August 2019, and directed the payments. When Kolfage had not been paid for June, he texted Badolato, and it was Badolato who arranged for a third party to receive money from WBTW and kick it back to Kolfage. Badolato was not the public face of WBTW, and his personal profits from the scheme paled in comparison to those of his co-conspirators, but he was nonetheless essential to the operation of the conspiracy. While he was involved in hiring attorneys and advisors, as his sentencing submission notes, he was also responsible for putting in place the scheme that made the WBTW operation criminal.

The need to afford adequate deterrence to criminal conduct likewise weighs in favor of a term of incarceration. Badolato's medical issues make it less likely that he will commit crime again in the future. However, as the Court knows, a defendant's medical issues, or his confinement to his home do not necessarily prevent him from committing a plethora of crimes over the phone and internet. That risk is particularly acute here: much of the unlawful conduct here was carried out online, and from the defendants' respective homes. Beyond the need to deter this particular defendant, there is a significant need for general deterrence. Substantial terms of imprisonment send messages to would-be internet fraudsters that there will be serious consequences for criminal conduct. That is particularly important with respect to online scams and schemes: there is a steady rise of crime committed over the internet, including non-profit and charity frauds like the scheme here.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

34

███████████████████████████████████████████████████

████████████████████████▌

In balancing the seriousness of Badolato's offense, and the significant need for deterrence here, against the mitigating factors he presents, a sentence at the bottom of the Sentencing Guidelines range—41 months' imprisonment—is the sentence sufficient but not greater than necessary under Section 3553(a).

**D.  Shea**

**1.  The Applicable Guidelines Range is 108 to 135 Months' Imprisonment**

Even as Shea continues to minimize his criminal conduct, he claims that he has accepted responsibility, and that he therefore deserves an offense-level decrease for acceptance of responsibility. Shea is not entitled to credit for acceptance of responsibility. His argument to the contrary relies on a selective reading of the relevant Application Notes and a self-serving revision of the defense case advanced at both of his trials.

As an initial matter, Shea ignores Application Note 4 of U.S.S.G. § 3E1.1, which provides that defendants who, like Shea, receive an enhancement under Section 3C1.1 for obstruction of justice are ordinarily not entitled to acceptance points. Although the Guidelines recognize that there may be "extraordinary cases" in which a defendant receives credit for acceptance of responsibility despite having engaged in obstructive conduct, Shea has not argued that his is the extraordinary case in which this is appropriate, nor could he.

Even on its own terms, Shea's acceptance argument fails. Application Note 2 of U.S.S.G. § 3E1.1 does allow for the possibility that a trial defendant can receive acceptance of responsibility

---

[8] The Government has redacted the two foregoing paragraphs at the request of Badolato's counsel, who requests that this information remain under seal.

points even after putting the Government to its burden of proof at trial. However, the note specifically provides that: "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." To the contrary, the note contemplates a scenario where the defendant's *pre-trial* conduct allows for a determination that the defendant accepted responsibility. *See id.* ("In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."). The examples provided by the Guidelines relate to legal defenses separate from assertions of factual innocence, "for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*

Defense counsel tries to shoehorn Shea's trial strategy into this narrow exception, by suggesting that Shea proceeded to trial to advance a venue defense. (Shea Mem. 15). That is plainly inconsistent with the arguments made on Shea's behalf in both trials and echoed in Shea's sentencing submission.[9] The fact that a defendant wishes he had taken a plea after being convicted at trial is certainly not the "rare" situation contemplated by the Guidelines. *See, e.g.*, *United States v. Roizman*, 408 F. App'x 443, 445-46 (2d Cir. 2011) (summary order) (affirming denial of acceptance points where the defendant was subject to an obstruction enhancement and could not "point to any pre-trial statements and conduct that indicate an acceptance of responsibility").

---

[9] *See, e.g.*, Tr. 697 (defense summation: "[T]he government keeps saying that my client, you know, he did this scheme, this crazy scheme, to get back Brian Kolfage's money. I submit to you that that is not true, that they can't prove that beyond a reasonable doubt, and that my client worked."); Shea Mem. 22 ("[M]uch of the money was actually used as the donors expected it to be. It is also very uncertain how many donors actually would have withheld their donations if there had been no misrepresentation….").

Given that the defendant is not entitled to acceptance of responsibility points, and consistent with what is set forth in the Presentence Report, the applicable Guidelines range is 108 to 135 months' imprisonment.

### 2.   Shea Should Be Sentenced to 63 Months' Imprisonment

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of Shea's offenses, the importance of general and specific deterrence, and the need to avoid unwarranted sentencing disparities, a sentence of 63 months' imprisonment would be sufficient but not greater than necessary to accomplish the purposes of sentencing.

*First*, the nature and seriousness of the offense and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Shea was instrumental in developing a scheme that wrongfully exploited hundreds of thousands of individual donors. The wire fraud scheme was sustained over a substantial period of time. He clearly understood how valuable Kolfage's public profile was, and how crafting a narrative around Kolfage's supposed altruism would allow them all to profit. Shea, along with his co-defendants, deceived donors in order to maximize their fundraising.

Shea's communications make clear that he was motivated by greed. From the beginning, Shea viewed this fundraising project as a cash cow. Even as the campaign was being launched, Shea, Kolfage, and Shea's wife were brainstorming ventures to monetize this campaign, to get emails, create a website, add affiliates, get people "to buy shit and we get money." (GX 1). In a group exchange at around the time of the campaign's launch, Shea's wife trumpeted the potential profits she hoped to gain: "It'll be a gold mine for sure." (GX 2). Shea's motivation is evident from the way he spoke about the campaign's donors. As the campaign went viral, Shea described their donors dismissively: "I mean, people are crazy. Who would throw money at something like this? At Christmas time!" (GX 4). His motivation is confirmed by the various ways he extracted money

from the organization over its lifetime, perhaps most egregiously with his theft of money to buy Trump-themed energy drinks. (GX 203A, 903). Shea, like his co-defendants, saw WBTW as a personal piggybank, brazenly ignoring the promises made to the donors funding it.

In addition, Shea, like Kolfage, committed multiple ancillary crimes that were spin-offs from the WBTW scheme, and that further emphasize both his greed and that his participation in the scheme was in no way an aberration. Before the charges in this case were filed, Shea filed a fraudulent tax return for 2019, falsely claiming, for example, that his personal car, a $70,000 Range Rover, was used 100% for business purposes. (Shea PSR ¶ 62). And Shea fraudulently obtained an Economic Injury Disaster Loan from the SBA on behalf of his shell company, RPMM. He submitted an application that fraudulently overstated RPMM's revenue and cost of goods sold—which are financial metrics on which the SBA relies in determining whether and in what amounts to issue those COVID-19 relief loans—and when he received an SBA loan of almost $60,000, he immediately transferred it to his personal bank account and spent it on personal expenses. (Shea PSR ¶¶ 60-61).

The seriousness of Shea's participation in the fraud scheme is matched by the seriousness of his obstruction of the investigation into it. Upon learning of a grand jury subpoena, Shea and his co-defendants exchanged a flurry of calls about the investigation. And immediately after, Shea and Kolfage tried to paper over their wrongdoing. They backdated documents to try to explain earlier kickbacks. (GX 128A, 153). Shea and Kolfage's falsification of documents was a brazen attempt to evade detection for the fraud scheme even as they knew that law enforcement were scrutinizing their conduct.

*Second*, the needs for specific and general deterrence necessitate a substantial term of incarceration. With respect to specific deterrence, it is notable that Shea continues to minimize and

deflect responsibility for his criminal conduct. For example, Shea, like Kolfage, suggests that the fundraising campaign was started with good intentions and went awry. Not so. As described above and contrary to what Shea states in his sentencing submission (Shea Mem. 3-4; Shea Mem. Ex. A at 1), it is absolutely clear that Shea and Kolfage knew that any funds raised could not simply be handed over to the United States government *even before* they launched a GoFundMe campaign promising to do exactly that. (GX 1). As Government Exhibit 1 makes clear, Kolfage, Shea, and Amanda Shea were communicating about the fundraising idea in mid-December before its launch, and Shea already understood that the funds could not go to the United States Government. After Kolfage texted Shea and Amanda Shea, "Let's create a gofundme to pay for the trump wall…And if trump doesn't take the money then we donate it to our organization," Shea almost immediately replied "Lol!!! That's so perfect!" He then explained to his wife, in the same text chain, "Amanda-trump can't take the money…so we could transfer it." (GX 1). Within a week, their GoFundMe page, "We The People Will Fund The Wall," was launched. (GX 301). In his sentencing letter, Shea claims that the "overwhelming outpouring of donations" caused him to "have a vision of being able to make [a] great deal of money which completely clouded my judgment as the months went on." (Shea Mem. Ex. A at 1-2). Shea's suggestion that the idea of profiting off their fundraising campaign arose, over months, because of its success is refuted by his messages at its very inception. As Shea well knew, the campaign was launched as a way to profit.

Furthermore, Shea's claim that he "misinterpreted the importance" of Kolfage's promise not to receive money is further undercut by his contemporaneous statements, which show that he understood they were telling significant and lucrative lies. In Government Exhibit 23, an exchange between Kolfage, Shea, and his wife related to the merchandise website, Shea asked Kolfage about how prominently they should display the claim: "Hey for the build the wall store, do we want this

statement at the top? […] all proceeds go directly to building the wall." When Kolfage responded, "I'll ask. I think since it can't be proven it's ok," Shea added: "K. I just don't want to go to jail." (GX 23). Despite Shea's revisionist interpretation of this exchange in his submission, that he was "concerned about making a false representation," the actual sequence of messages makes clear that Shea's concern was not truthfulness but being found out. In response to Shea's question about including the text, Kolfage reassured him that it could not be "proven"—not that it was true. Shea's response did not question Kolfage's answer, he was evidently satisfied by this explanation because he did not "want to go to jail." Shea's claim that he was, in effect, raising an alarm is simply inconsistent with the basic text of their messages.

In addition, Shea claims that he did not know about "the secret salary agreement" and he "only learned of it after his arrest." (Shea Mem. 4). Shea admits only that he knew Kolfage was taking payments and he assisted Kolfage in doing so. (Shea Mem. Ex. A at 2). The defendant does not grapple with the fact that he assisted Kolfage in receiving the very monthly salary payments that had been agreed upon. His denial is particularly glaring as he offers no explanation for how he knew to pay Kolfage kickbacks in the same amount and on the same schedule that was negotiated and discussed. As described above, Shea's claim that he has now accepted responsibility falls flat. The defendant's efforts to rewrite his communications, to make his involvement seem accidental and trivial, raise a real concern about his remorse and his willingness to take responsibility for his own conduct, both of which are relevant in evaluating whether he will return to crime.

There is also a particular need for general deterrence on the facts of this case. This was a sophisticated fraud scheme that was difficult to detect, where general deterrence is particularly important. But in addition, the defendants, including Shea, took steps to obstruct the investigation

and falsify documents upon learning of the investigation. A substantial sentence is necessary to send a message to wrongdoers that obstruction of ongoing investigations will lead to serious consequences.

*Third*, the need to avoid unwanted sentencing disparities suggests that a below-Guidelines sentence would be appropriate. The Government is mindful of how the Guidelines ranges for Shea's co-defendants comport with their relative culpability and differing circumstances. With respect to the offense conduct, Shea was an active and enthusiastic participant in the scheme who received substantial personal benefits, but he was not its organizer or public face. He certainly was less critical to the scheme than either Badolato or Kolfage. At the same time, Shea's co-defendants present multiple significant mitigating factors that Shea does not. Kolfage suffered grievous injuries while serving in this country's military. Badolato reportedly suffered a recent stroke. And both co-defendants accepted responsibility before trial and pled guilty. Shea's refusal to accept responsibility through two trials—which continues even now, as he minimizes his involvement while half-heartedly accepting responsibility in the hopes of receiving leniency at sentencing—is a meaningful distinction that can and should be considered at sentencing. All the same, given the applicable Guidelines ranges of Shea's co-defendants and Shea's relative culpability, a downward variance from the Guidelines range of 108 to 135 months is appropriate.

However, a substantial sentence of incarceration is still necessary for all the reasons discussed above. Shea's request for a sentence of 24 months' imprisonment is wholly inadequate. The basis for his request is his claim that the Government's "original plea offer[]…placed his sentencing range at a level of about 24 months." (Shea Mem. 20). The Government in fact offered Shea a plea, in March 2022, that would have carried Guidelines of 27 to 33 months. But Shea should not receive the benefit of a plea offer that he *rejected* and that was made before he twice

put the Government to its burden at trial. Further, the original plea offer reflected the Government's view of facts at the time, which changed as the Government continued to investigate up to and through both trials. The plea offer included a mitigating role adjustment that, having continued to develop its evidence against Shea after he rejected the offer, the Government now recognizes is inappropriate. (Probation likewise does not recommend a mitigating role adjustment, and even Shea himself agrees that not including that adjustment is correct (Shea Mem. 22 (stating that the Probation Office's Guidelines calculation is "correct")).) The Government's pre-trial plea offer also did not include an enhancement for obstruction of justice, the facts of which, as discussed above, were not fully developed at that time. And, of course, the plea offer assumed Shea would be accepting responsibility, which he did not. The sentence that Shea is seeking cannot be reconciled with the facts before the Court at his post-trial sentencing.

Even the Probation Office's recommendation of 54 months—50% of the bottom of the Guidelines range—fails to fully account for the seriousness of the conduct, the defendant's refusal to accept responsibility, his continued minimization of his offense conduct, and the particular need for general deterrence on these facts.

Shea committed serious crimes motivated by greed, then again broke the law as he took steps to obstruct the Government's investigation of his misconduct. While the Government agrees that his culpability, relative to his co-defendants, is a basis for a meaningful downward variance, Shea's serious crimes deserve serious sanction. A sentence of 63 months in prison is significantly below the Guidelines, and is below the sentence the Government would likely seek for Kolfage or Badolato if their personal circumstances or their lack of acceptance of responsibility were similar to Shea's. A sentence of 63 months' imprisonment would be sufficient but not greater than necessary under Section 3553(a).

42

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should impose sentences of 51 months' imprisonment on Brian Kolfage, 41 months' imprisonment on Andrew Badolato, and 63 months' imprisonment on Timothy Shea.

Dated:          New York, New York
                April 19, 2023

                                Respectfully submitted,

                                DAMIAN WILLIAMS
                                United States Attorney

                        By:     _____/s/_____
                                Mollie Bracewell
                                Nicolas Roos
                                Robert B. Sobelman
                                Derek Wikstrom
                                Assistant United States Attorneys
                                (212) 637-2218 / 2421 / 2616 / 1085